**Captain Susan R. STRUCK, Plaintiff-Appellant,**

v.

**SECRETARY OF DEFENSE et al., Defendants-Appellees.**

**No. 71–1150.**

United States Court of Appeals, Ninth Circuit.

Nov. 15, 1971.

As Modified on Denial of Rehearing and Rehearing In Banc May 4, 1972.

Jan E. Peterson, (argued), Seattle, Wash., David McGoldrick, Tacoma, Wash., Michael H. Rosen, Seattle, Wash., for plaintiff-appellant.

Richard F. Locke, Asst. U. S. Atty., San Francisco, Cal. (argued), L. Patrick Gray, III, Asst. Atty. Gen., Washington, D. C., for defendants-appellees.

Before CHAMBERS, Circuit Judge, MADDEN,* Judge of the United States Court of Claims, and DUNIWAY, Circuit Judge.

MADDEN, Judge:

Captain Susan R. Struck, of the United States Air Force, hereinafter sometimes referred to as the appellant, brought the action from which the instant appeal arises, in the United States District Court for the Western District of Washington. Her suit sought a permanent injunction and declaratory relief "To Prevent Unlawful Discharge from Military Service." The Air Force filed an answer to the complaint and made a motion to dismiss. Briefs were filed and oral arguments were heard by the District Court on January 29, 1971. The Court made findings of fact which we summarize as follows:

Captain Struck entered on active duty in the United States Air Force on April 8, 1967, as a commissioned officer, and served continuously on active duty from that date. On and prior to the date of her commission and continuously thereafter there was a regulation, promulgated by the Secretary of the Air Force, providing for the discharge from the Air Force of officers who became pregnant. During 1970, while serving on active duty in Viet Nam, Captain Struck became pregnant. About October 16, 1970, she appeared before a duly constituted Board of Officers duly convened pursuant to the pertinent statute. The Board found that she was pregnant and recommended her separation from the Air Force with an honorable discharge. About October 26, 1970, the Secretary of the Air Force, after review by an Air

---

* J. Warren Madden, Senior Judge, United States Court of Claims, sitting by designation.

Force Personnel Board, approved the findings and recommendations of the Board of Officers and directed that Captain Struck be discharged, with an honorable discharge, as soon as possible. Orders were promulgated effecting Captain Struck's discharge on October 28, 1970. However, the District Judge who was sitting on October 28, 1970, issued a 24 hour stay of the effective date of the discharge. On October 29, 1970, an application for a temporary stay was made to this United States Court of Appeals, and was denied by it. Also on October 29, 1970, Captain Struck's discharge was temporarily stayed by a Judge of this Court of Appeals, until her motion for a preliminary injunction could be considered by a panel of this Court. On December 7, 1970, this Court denied Captain Struck's motion for temporary relief, but stayed the order for her discharge for a period of ten days after the filing of this Court's order denying her temporary relief. On December 17, 1970, Mr. Justice Douglas of the Supreme Court of the United States, upon application, entered an order that her discharge be stayed pending final decision on the merits in the United States District Court for the Western District of Washington.

The District Court on February 1, 1970, filed its Conclusions of Law, which are to the effect that the Air Force Regulation concerning discharge of pregnant officers is reasonable and constitutional; that Captain Struck might therefore be lawfully discharged; that the District Court's Findings of Fact and Conclusions of Law constituted that Court's final determination "on the merits" as the District Court understood the language of Mr. Justice Douglas in his order of December 17, 1970; that upon defendant's motion the complaint was dismissed with prejudice and with costs; that Captain Struck's oral application for a stay pending appeal, made after the District Court had rendered its adverse oral opinion on January 29, 1971, was denied.

There are no disputed questions of fact. There is no problem about the meaning of the text, Air Force Regulation 36–12. It is clear and free from ambiguity. It says:

40. The commission of any woman officer will be terminated with the least practical delay when it is determined that one of the conditions in a or b *below* exist . . .

　a. Pregnancy:

　(1) *General*:

　(a) A woman will be discharged from the service with the least practical delay when a determination is made by a medical officer that she is pregnant. . . .

　　\*　　\*　　\*　　\*　　\*

　b. Minor Children:

　(1) *General.* The commission of any woman officer will be terminated with the least practical delay when it is established that she:

　　\*　　\*　　\*　　\*　　\*

　(d) Has given birth to a living child while in a commissioner officer status.

The attack, then, upon the action of the Air Force, the discharge of Captain Struck, must be and is an attack upon the constitutionality of the Regulation.

■■ Captain Struck urges that Air Force Regulation is unconstitutional because its application would deprive her of liberty or property without due process of law, in violation of the Fifth Amendment. Her claim apparently is that the Regulation is arbitrary and irrational. One who brings such an indictment against the public entity which enacts legislation has, properly, a heavy burden of persuasion. As to Regulation 36–12 we are not persuaded that it is either arbitrary or irrational. In the instant case, Captain Struck was on duty in the nursing activity of the Air Corps in Viet Nam in September 1970. By that time she had been pregnant for several months. If, by an error of our own forces, or an attack by the enemy, the hospital of which she was in charge or

in which she worked had been damaged and patients and hospital personnel had been injured or had been frightened and confused, a not improbable consequence might have been that the Captain, as a result of injury or shock might have suffered a miscarriage, and become a patient instead of a nurse. As such, instead of being a useful soldier, she would have been a liability and a burden to the Air Force. The fact that other personnel, males and non-pregnant females, might have been disabled and made useless in the attack is irrelevant. Those events would have been the result of the fortunes of war. But as to the pregnant officer-nurse, the Air Corps, when it had become aware of her pregnancy, would have acted imprudently if it allowed her to remain in the zone of active fighting. She was in fact removed to the United States, and the discharge proceedings involved in the instant appeal took place.

Air Force Regulation 36–12 is not in conflict with the Fifth Amendment's Due Process Clause.

Captain Struck argues, in effect, that it is uneconomical and unwise to discharge an officer, whose training has been costly to the Government, because she has become pregnant. She points to her own situation saying "During her pregnancy she did not miss one day of duty. At all times she was ready, willing and able to perform her duties as an Air Force nurse." But we recall that she was removed from the fighting zone, for the good of the service and of herself and her unborn child. The wisdom of legislation and the answer to the question of whether the Court, if it had been the legislature, would have enacted the legislation is no concern of the Court. The appellant refers to a provision in Air Force Manual to the effect that if an Air Force Officer's wife is pregnant "port call orders will not fall during the period six weeks before or six weeks after expected delivery." We think there is a palpable difference between an expectant father and an expectant mother as regards the question

of whether the progress of the expectancy, or its culmination, will, or may, or probably will disable the soldier from performing the duties of a soldier. As to the expectant father, his leave, or the deferment of his post call orders, are not irrevocable, we suppose, if his performance as a soldier is needed.

Captain Struck argues that because the Secretary of the Air Force may waive the application of § 36–12, the Regulation itself is invalid. We find no merit in the argument. There might well be situations in which the particular circumstances, long length of service, highly special qualifications or experience, would induce the Secretary to waive the Regulation. It is his discretion, not that of a Court, that is involved.

The appellant correctly points out that the Due Process Clause of the Fifth Amendment may, in a proper case, invalidate Federal official action of a kind which, if done by a State, would violate the Equal Protection Clause of the Fourteenth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). But a relevant physical difference between males and females justifies their separate classification for some purposes, and avoids the problem of a denial of Equal Protection of the Law. The Court, in Gruenwald v. Gardner, 390 F.2d 591 (CA 2, 1968), says:

> [T]he "two sexes are not fungible" * * * and special recognition and favored treatment can constitutionally be afforded women. * * * It is only the "invidious discrimination" or the classification which is "patently arbitrary [and] utterly lacking in rational justification" which is barred by either the "due process" or "equal protection" clauses. * * * A classification or regulation, on the other hand, "which is reasonable in relation to its subject and is adopted in the interest of the community is due process."

The appellant's brief contains a heading, "A.F.R. 36–12 violates appellant's right to privacy under the Constitution." The elaboration of the heading is short. When we recall the length and variety of the opinions of the Justices of the Supreme Court on the privacy question in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), we may be forgiven for thinking that the appellant's mere *ipse dixit* should not suffice to invalidate the Air Force Regulation. But the matter is simplified by a sentence in the appellant's brief:

 * * * Without a substantial showing of necessity, the military should not be constitutionally allowed to invade this most personal and private right of its women officers.

We think the necessity for, or at least the high degree of rationality of Air Force Regulation 36–12 shows plainly through the fabric of this case. We find no merit in the appellant's claim of violation of her privacy.

In Orloff v. Willoughby, 345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953) the Court said, without ambiguity or qualification, "But judges are not given the task of running the Army." Captain Struck is asking us to displace the military authorities in cases of the pregnancy of military personnel, and to say to the Air Force, and to every other branch of the Military Service, "You must not, under the penalty of contempt of court, separate this woman from her military service. And you must not discriminate against her and prejudice her in her military career by doing what you did to Captain Struck, that is, removing her from the zone of combat, and from the exercise, anywhere, of her professional skill which in Captain Struck's case was that of a nurse."

If the Court issued such an injunction and the results were unfortunate, perhaps disastrous, the question would be, "Why was the Military so imprudent as to permit so vulnerable an officer or soldier to be in such a position?" The Military's truthful answer would be, "We were compelled to do it by an order of a Court. The Court was, in this situation, 'running the Army' ".

 Captain Struck asserts that Air Force Regulations deny to her her First Amendment right to Freedom of Religion. She points to Part I, C of 1971 Amendments to the Regulations, which Amendment says "Discharge Action will be cancelled if Pregnancy is Terminated." She says that abortion, as one method of terminating the discharge proceedings against her, was not available to her because she was a Roman Catholic and her religious convictions did not permit her to have an abortion. No doubt many female soldiers would not resort to abortion because they think it is, or should be a criminal act, but in their cases, no Constitutional problem would be involved.

The answer to the question of whether a statute or other public regulation or action constitutes an interference with the Free Exercise of Religion, or an Establishment of Religion, is, and for decades has been, one of the most elusive in our law. Chief Justice Burger, in the case of Walz v. Tax Commissioner, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1969), elaborated the subtleties and difficulties of the problem. He discussed Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952); Sherbert v. Verner, 374 U.S. 398, 83 S. Ct. 1790, 10 L.Ed.2d 965 (1963), and other cases. He said:

 Each value judgment under the Religion clauses must therefore turn on whether particular acts in question are intended to * * * interfere with religious beliefs and practices or have the effect of doing so.

In our instant case it is not claimed nor could it be claimed that the Military, in drafting and amending Regulation 36–12 intended to discriminate against female soldiers whose religious principles forbade abortions. But the Chief Justice's last clause in the quoted state-

ment, "or have the effect of doing so" requires consideration. In Sherbert v. Verner, *supra*, Mr. Justice Brennan recognized that the mere fact that government action would or might have some tendency to affect adversely the Free Exercise of Religion did not close the inquiry. The opinion said, at p. 406 of 374 U.S. 398, at p. 1795 of 83 S.Ct.:

> We must next consider whether some compelling state interest enforced in the eligibility provisions of the South Carolina statute justifies the substantial infringement of the appellant's First Amendment right. It is basic that no showing merely of a rational relationship to some colorable state interest would suffice in this highly sensitive constitutional area.

The Military, in legislating on the subject of what to do about pregnant female soldiers, was dealing with a "compelling" public interest, the importance of which we have discussed hereinabove. But the Military also had to deal with the subject of terminated pregnancies. The termination of the pregnancy would terminate the disability, and the discharge of the soldier would be a wasteful loss of training and experience. So the Military said that the termination of pregnancy should terminate the discharge proceedings. But Captain Struck says that this rule about the termination of pregnancy discriminates against her because it sets her apart from other female soldiers not affected by religious principles. The Military, if that problem had occurred to it, might well have thought that if it exempted Roman Catholics, and perhaps members of other religions, the principles of which forbade abortions, it would be chargeable with a violation of the No Establishment of Religion Clause of the First Amendment. This aspect of the problem is presented at length in the separate opinions of three Justices in Sherbert v. Verner, *supra*.

We recur now to our quotation, *supra*, from the Court's opinion in Sherbert v. Verner. Our conclusion on the Free Exercise of Religion problem raised by Captain Struck is that there is a compelling public interest in not having pregnant female soldiers in the Military establishment, that such a soldier is equally vulnerable, whether she has no religion, or a religion which forbids abortions, and that perfect and universal Free Exercise of Religion must. give way to the slight extent necessary to conserve the compelling public interest, there being no practicable way to conserve both interests. It will be remembered that the Freedom of Exercise of Religion problem is purely hypothetical in this case.

The judgment of the District Court dismissing the appellant's action is affirmed. The stay heretofore entered by this Court will be dissolved 21 days after the date of the filing of this order. This will enable appellant to apply to the Circuit Justice for a further stay, if she desires to do so.

On Petition for Rehearing and Suggestion of a Rehearing in Banc

Before CHAMBERS, Chief Judge, MADDEN,\* Judge, United States Court of Claims, and DUNIWAY and WRIGHT, Circuit Judges.

## ORDER

Judge Madden having died while the petition for a rehearing was pending, Circuit Judge Wright was chosen by lot to take his place on the panel to consider the petition for a rehearing. Chief Judge Chambers and Circuit Judge Wright vote to deny the petition for a rehearing by the panel. Circuit Judge Duniway votes to grant a rehearing by the panel, and files a dissenting opinion.

All members of the court in active service have considered the suggestion of a rehearing in banc, and a majority

---

\* The Honorable J. Warren Madden, Judge, United States Court of Claims, sitting by designation. Judge Madden died on February 17, 1972.

votes against a rehearing in banc. Circuit Judges Browning, Duniway, Ely, Hufstedler and Goodwin vote to grant a rehearing in banc.

Circuit Judge Hufstedler concurs in Circuit Judge Duniway's dissenting opinion.

The petition for a rehearing is denied. The suggestion of a rehearing in banc is rejected.

DUNIWAY, Circuit Judge (dissenting).

I dissent. I think that the panel should grant a rehearing. As a member of the panel that first heard the case, I concurred in Judge Madden's opinion. However, the petition for rehearing and the decision in Reed v. Reed, 1971, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225, persuade me that a rehearing should be granted, and the judgment appealed from reversed.

In Reed v. Reed, *supra,* a unanimous Court in an opinion by the Chief Justice, held that a state statute giving preference to males over females in the administration of estates violates the equal protection clause of the Fourteenth Amendment. In so doing, the Court held that the difference·in sex of the competing applicants for letters of administration bore no "rational relationship to a state objective that is sought ·to be advanced." (92 S.Ct. p. 254.) The principle of the *Reed* decision is applicable here because federal action of a kind which, if done by a state, would violate the equal protection clause of the Fourteenth Amendment, is a violation of ·the due process clause of the Fifth Amendment. Bolling v. Sharpe, 1954, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884.

It is not yet clear whether classification based upon sex is "suspect," and therefore can be sustained only upon a showing by the government that a compelling interest makes the classification necessary. *Cf.* Shapiro v. Thompson, 1969, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (classification based on length of residence as affecting right of interstate movement); Loving v. Virginia, 1967, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010, and Korematsu v. United States, 1944, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (classification based on race); Sail'er Inn, Inc. v. Kirby, 1971, 5 Cal.3d 1, 17–18, 95 Cal.Rptr. 329, 340, 485 P.2d 529, 539–540 (classification based on sex). I think, however, that eventually the Supreme Court will so hold. Be that as it may, *Reed, supra,* does not purport to go that far, but the criterion that it does establish requires that we hold that the regulation here in question is invalid. I can find no rational relationship between the regulation and any legitimate objective that it can be said to seek to achieve.

It is not enough to say that there are physical differences between men and women, or that men and women are not fungible. Rather, the question is, does the regulation take account of the differences in a rational way? Nor is it enough to say that only women can become pregnant and that therefore it is rational to treat pregnancy differently from all other physical disabilities. There are other disabilities to which only females are subject, just as there are some to which only men are subject. For example, no woman can suffer from "undiagosed enlargement or mass of the testicle or epiditymis," which under Army Reg. 40–501, ¶ 2–14 m(2), disqualifies a man for military service. The question is, in view of the general obligation to treat the sexes alike established in *Reed, supra,* whether there is a rational basis for the special and unique treatment of pregnancy embodied in the regulation. I can find none. Indeed, the regulation seems to me to be quite irrational.

I start with certain assumptions. One is that the government has a legitimate interest in the health and welfare of pregnant women and their unborn children in general, and in particular of those women who are federal employees. A second is that the government (including especially the military branch of government) also has a legitimate interest

in maintaining effective military forces. If there be any other interest that could be advanced as the basis for promulgating Regulation 36–12, I am not aware of it.

I first consider subsection (a) of Regulation 36–12. It creates, among others, the following classifications: (1) pregnant female officers versus non-pregnant female officers; (2) pregnant female officers versus non-pregnant female employees who are not officers; (3) detectable pregnancy versus all other physical conditions that may or can endure for not more than nine months in the persons of male or female officers. Do such classifications have any rational relationship to the health or welfare of the pregnant female officer or her unborn child, or both, as a separate class? I can find none. Even if every female government employee were included in the class, it could not stand. To sustain it, there would have to be some evidence that continued employment of such female employees would be detrimental to their health. I am aware of no such evidence. On the contrary, centuries of human experience attest to the reality that pregnant women work throughout their pregnancies, whether that work be performed in fields, mills, factories, stores or offices, or in homes cleaning house, cooking, and tending their husbands and their other children. Of course, not all pregnant women work and at least some pregnant women who work have health problems. But neither the fact of work nor the fact that one is paid for work has any necessary relationship to maternal and infant health.

No doubt it is true that the particular work that a pregnant woman may be called on to perform may affect her health. So, too, the time during her pregnancy when she is called upon to perform it may have such effect. But these considerations do not save subsection (a). That subsection takes no account of them; it cannot be sustained on the basis of criteria that it does not fit.

Similarly, I can find no rational relationship between subsection (a) and the interest of the government, through the Air Force, in maintaining effective personnel. Is there any evidence that detectably pregnant officers are less able to perform their duties than non-pregnant female employees with similar jobs? I pose this question because the sole criterion for discharge that the regulation establishes is medically detected pregnancy. One whose pregnancy is detected at eight days is treated differently from all other non-pregnant female employees. The apppropiaté inquiry, therefore, is whether or not women at any detectable stage of pregnancy are measurably less able to perform their tasks than non-pregnant women employees. Again, I am unaware of any empirical data that support that affirmative.

It is immaterial whether a female who is, say, eight months pregnant, may be less able to work than a non-pregnant female. It is equally immaterial whether a pregnant female is less able to work under combat conditions. The regulation does not use these criteria; it totally disregards them.

Of especial constitutional significance is the classification of detectable pregnancy versus any other kind of temporary "physical disability." The fact alone of detectable pregnancy mandates discharge. No other temporary physical condition results· in mandatory discharge. There is obviously a difference between pregnancy and all other temporary physical conditions. But under *Reed, supra*, a classification based on that difference is not constitutional unless the difference bears some rational relation to the governmental interest served. Is there any evidence that pregnancy has some effect on ability to function as an officer that is different from any other temporary physical condition? For example, is there any reason to believe that a female officer who has suffered a fractured leg is better able to perform her job than a female officer who is eight days pregnant? The former gets medical leave and retains her commission; the latter is discharged. Why? If this be rational, nothing is irrational!

It is no answer at all to say, as does the court's opinion, that "other personnel . . . might [be] disabled and made useless. Those events would have been the fortunes of war." Under subsection (a) it is completely immaterial whether the pregnant officer is in combat or not. It is also completely immaterial how or when any other "disability" occurred. An officer who fractures her leg skiing is not subject to mandatory discharge any more than one whose leg is fractured in combat. Moreover, under subsection (a) any event that occurs after detection of pregnancy is immaterial. The officer is discharged "with the least practical delay." She is no less dischargeable if she miscarries three days later.

The conclusion follows that subsection (a) of the regulation is unconstitutional on its face.

I turn to subsection (b) (d). Here discharge is mandated upon proof that a female officer has given birth to a living child while she was an officer. No other governmental interests appear here than those mentioned in the discussion of subsection (a).

Here is a non-exclusive list of classifications created by subsection (b) (d): (1) commissioned officers who are mothers versus commissioned officers who are fathers; (2) commissioned female officers who give up their children for adoption versus commissioned male officers who give up their children for adoption; (3) commissioned female officers whose infants have been voluntarily or involuntarily aborted versus commissioned female officers who delivered their infants; (4) commissioned female officers who have babies versus other female employees of the federal government who have babies.

Obviously the sexes are not fungible. That fact, however, does not show that the difference between the persons in each of the above classifications has "a fair and substantial relation to the object of the legislation" (Reed, supra). What and where is the compelling interest of the government that is necessarily served by these classifications? Why should a female officer whose infant is adopted lose her commission (Captain Struck's situation), and a male officer whose infant is adopted keep his? Why should a female officer who aborts her child keep her commission, and a female officer who delivers her child forfeit her commission? Why should a female officer who has a baby forfeit her career, and every other female federal employee keep hers if she wishes to do so? I cannot find an answer to these questions, and I therefore conclude that subsection (b) (d) is likewise unconstitutional on its face.

To grant relief here is not to transfer to judges the task of running the army. (See Orloff v. Willoughby, 1953, 345 U.S. 83, 93, 73 S.Ct. 534, 97 L.Ed. 842). The Armed Forces are not above the Constitution, but are subordinate to it. If they adopt regulations that violate the Constitution, it is the plain duty of the courts to say so. I cannot believe that any of my colleagues would hesitate for a moment to strike down a regulation stating that no person of African ancestry can be commissioned, or one stating that all such persons now holding commissions shall be discharged. In principle, this case is no different.

I would grant a rehearing and reverse the judgment.