Stephanie CRAWFORD, Appellant,

v.

General Robert E. CUSHMAN, Jr.,
Commandant, United States
Marine Corps, Appellee.

No. 49, Docket 75–7114.

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1975.

Decided Feb. 23, 1976.

Kathleen Peratis, American Civil Liberties Union Foundation, New York City

(Ruth Bader Ginsburg, Melvin L. Wulf, New York City, on the brief), Mary Just Skinner, Vermont Legal Aid, Inc., Montpelier, Vt., for appellant.

William B. Gray, Asst. U. S. Atty., Rutland, N. Y. (George W. F. Cook, U. S. Atty. for the District of Vermont, Rutland, Vt., of counsel), for appellee.

Before MOORE, FEINBERG and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal challenges, on due process and equal protection grounds, a now outmoded Marine Corps regulation which mandated the discharge of women Marines for pregnancy. The United States District Court for the District of Vermont, James S. Holden, *Chief Judge*, held that the regulation in question has a rational basis in terms of military readiness and mobility in addition to other practical, administrative considerations and did not operate against women as a class generally, reaching only women who became pregnant, so that it was constitutionally valid. *Crawford v. Cushman*, 378 F.Supp. 717, 725–26 (D.Vt. 1974). Jurisdiction is under 28 U.S.C. § 1361. We disagree with the district court and hence reverse.

## I. FACTS

Appellant Crawford at the age of 21 was accepted for enlistment in the United States Marine Corps on February 5, 1968, for a term of four years. She was a single person then and remained unmarried throughout her entire enlistment. She first learned that pregnancy would result in an automatic discharge during her basic training at boot camp.

Appellant's service school instruction included secretarial and data processing training. She was eventually assigned to office work at the Marine Corps Air Station, El Toro, California, where she resided in open barracks with approximately 150 other female Marines.

Appellant conceived a child in March of 1970, although she did not learn this until May of 1970. In the period March to May she reported to the base infirmary on a number of occasions, complaining of nausea, fainting, blackout spells and the like, and was transferred at her request to a change in duty assignment because of "emotional pressure." However, neither her personal nor medical history or condition were evaluated at all, in terms of her readiness to serve, by Marine Corps authorities, once it was learned that she was pregnant, because the pertinent regulation specifically provided that "a woman member, whether married or unmarried, upon certification by a medical officer that she is pregnant, shall be discharged by her commander, for the convenience of the Government . . ."[1] She was discharged on May 27, 1970, "for the convenience of the Government—under

---

1. On May 27, 1970, the pertinent provisions (MCO P1900.16 ¶ 6012, as modified by change 2 of 21 November 1969), provided:

 Discharge or Release from Active Duty for Convenience of the Government
 1. The Secretary of the Navy, or the Commandant of the Marine Corps, may authorize or direct the discharge or release from active duty of a Marine for the convenience of the Government for any one of the following reasons:

 . . . . .

 c. A woman member, whether married or unmarried, upon certification by a medical officer that she is pregnant, shall be discharged by her commander, for the convenience of the Government, or in the case of overseas commands, will be transferred to a

major Marine Corps command housing Women Marines in the continental United States for discharge. The character of the discharge certificate issued in these cases will be as warranted by the woman member's service record, regardless of her marital status. In the case of discharge for reason of the pregnancy of a woman member who is an unmarried minor (under 21 years), her commander will notify her parents or guardian of the fact and reason for the discharge. If, as a result of a spontaneous or therapeutic abortion, or a stillbirth, the woman member's pregnancy is terminated prior to her separation from the service, she will nevertheless be discharged for convenience of the Government unless she requests, in writing, that she be retained in the service. In such latter case, the woman member, at the discretion of

honorable conditions."[2] Following her discharge the appellant moved to Vermont. While it is immaterial for our purposes, since the challenged regulation made discharge mandatory, it is a fact that during some of her prenatal period the appellant was confined to bed as a result of aggravation of a prior back injury by her pregnancy and she also sustained an ankle injury as a result of a fall. 378 F.Supp. at 720. Nevertheless, her medical records, the court below found, indicate nothing medically to have prevented her from carrying on her assigned military occupation as late as the seventh month of pregnancy. *Id.*

On December 13, 1970, appellant gave birth to a baby girl. She made a good recovery after childbirth and was able to work six weeks later. The disability caused to her by pregnancy was, as the trial court found, "temporary only." In January, 1971, appellant submitted a written reenlistment application but was advised that because she had a dependent child her application would not be approved.[3]

---

her commander, may be retained in the service, if she is found physically qualified for retention.
On June 28, 1972, MCO P1900.16A ¶ 1612 instituted the following procedure regarding pregnant Marines:

d. Waivers [of the discharge provisions] may be requested from the Commandant of the Marine Corps (Code DM) in those cases where the Woman Marine is a parent, stepparent, has personal custody of, or adopts a child. Each request will be considered on its own merits, taking into consideration such factors as length of service of the requestor, ages and number of children involved, record of individual and the Commanding Officer's evaluation of the situation. Any Waiver so granted will be effective only so long as parenthood, stepparenthood or custody does not conflict with normal career assignment.

The present policy is reflected in MCO 500.12 of July 16, 1975:

3. *Policy.* Women Marines who are pregnant may, upon request, be discharged or retained on active duty if otherwise qualified. The fact of pregnancy or parenthood does not entitle women Marines to special treatment or consideration except as otherwise specified in this Order. In specific regard to unavailability for assignments, women Marines who remain on active duty while parents are guaranteed no special consideration

---

The trial court attributed no significance to the fact that appellant had voiced no objection to her discharge at the time of her release from military service, doubtless because she wanted to remain in the Marine Corps and, according to her testimony, would have gone to any duty station where she might have been assigned. Without independent legal advice, moreover, her failure to object could not be treated as a "knowing" waiver. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed. 2d 1094 (1967); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

In 1970 there were approximately 310,000 Marines on active duty, of which 2,000 were women. Military missions of the Marine Corps obviously require readiness and mobility; the great traditions of the Corps are sufficient testament to that. All personnel are expected to respond on short notice and without restriction to orders that might direct expeditious movement from one location to another, these demands being made upon women Marines as well.

in duty assignments or duty stations based solely on pregnancy or the fact that dependents are involved. Commanding officers will initiate action for discharge citing the appropriate provisions of reference (a) in the case of women Marines who fail to maintain themselves reasonably available for duty and productive as Marines after becoming parents.

2. The character of the discharge certificate issued under the regulation, note 1 *supra,* is "as warranted by the woman member's service record."

3. From September 4, 1970, to June 1, 1972, MCO P1100.61B ¶ 2209 provided:

3. Women applicants who have a child or children under 18 years of age are unacceptable for enlistment or reenlistment. The term "child or children" means offspring of the woman herself, stepchildren, adopted or foster children. The fact that she has surrendered all rights to custody or control of the child or children through divorce proceedings or through formal adoption does not alter her status of unacceptability for enlistment or reenlistment.

Appellant's denial of reenlistment under this regulation is not "separately challenged" on appeal, *see* note 18 *infra.*

Each woman in the Marines is assigned a skill and her duty station is determined by the needs of the Corps for the particular specialty she has. By virtue of 10 U.S.C. § 6015 assignment of women Marines to aircraft engaged in combat missions is forbidden and duty on naval vessels is confined to hospital ships and transports. *See Schlesinger v. Ballard,* 419 U.S. 498, 508, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975) (Navy women accordingly have lesser seagoing service than men). Female enlisted personnel are required to live in barracks, to participate in formations, ceremonial and otherwise, and are also required to attend to daily policing of barracks at 0600 hours and to report for duty at 0730. While the trial court found that there are no nurseries or other facilities at Marines installations for the care of children of Marine personnel, the Government had admitted in its answer to interrogatories that day care facilities were provided at some 17 Marine Corps bases including the El Toro, California, Marine Corps Air Station. It should further be noted that the Marine Corps does not maintain health services on its own; medical services are provided by the Navy and are available at major bases in the continental United States and in overseas stations. In a few locations where medical care is limited to dispensaries, the dispensary staff would not normally have the capability of providing obstetrical care.

It is important to note that at the time the appellant was discharged from military service, the *only* temporary physical disability which was cause for mandatory discharge was that of pregnancy. The capacity to serve of all other temporarily disabled personnel was and presumably still is treated on an individual basis. Depending upon the severity of one's condition a Marine Corps member might be excused from many or all of his or her duties, placed on "light duty," temporarily hospitalized or placed on temporary convalescent leave. If appropriate hospital facilities were not available, he or she could be transferred to a base which has the necessary facilities. Alcoholics, for example, are referred for treatment to a medical or alcoholic rehabilitation center. In all cases of temporary disability other than pregnancy the member is returned to his or her regular command or post as soon as he or she is able.

The principal justification advanced by the Marine Corps for its pregnancy regulation in addition to the demands of readiness and mobility is administrative convenience, explained in terms of "knowing where your people are and their capacity to respond," and not in terms of complexity of paper work or lack of appropriate facilities. No medical studies regarding the physical abilities of pregnant women were made or relied upon by the Marine Corps prior to promulgation of the mandatory discharge regulation which, along with similar former regulations of other services, seems to have stemmed from a 1951 Executive Order. *See* Exec. Order No. 10,240, 3 C.F.R. § 749 (1949–53 Comp.); Note, *Pregnancy Discharges in the Military: The Air Force Experience,* 86 Harv.L.Rev. 568, 568–69 n. 9. (1973) [hereinafter "Note, *Pregnancy Discharges*"]. The only medical evidence at trial below came from appellant's attending obstetrician. This uncontradicted evidence established that there is no physiological reason to prevent women from working during the early stages of pregnancy absent complications, that most complications which develop during the early months of pregnancy do not usually require hospitalization, and that in any event each patient requires individual treatment. *See also Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 645–46 n. 12, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974).

## II. LEGAL BACKGROUND

The question of mandatory pregnancy discharge comes neither to this court nor under constitutional challenge for the first time here. Mandatory leave for pregnant school teachers was held unconstitutional as a denial of equal protection of the laws in *Green v. Waterford Board of Education,* 473 F.2d 629 (2d Cir. 1973). *See also* Comment, *Mandatory Maternity Leave of Ab-*

*sence Policies—An Equal Protection Analysis,* 45 Temple L.Q. 240, 245, 257–58 (1972). The Supreme Court held mandatory maternity leave rules for pregnant school teachers to violate the Due Process clause of the Fourteenth Amendment, by way of creating a conclusive presumption that every teacher who is four to five months pregnant is physically incapable of continuing her duties, whereas any such teacher's ability to continue past a fixed pregnancy period is an individual matter. *Cleveland Board of Education v. LaFleur, supra,* 414 U.S. at 639–48, 94 S.Ct. 791. The Court also held that a rule making a teacher ineligible to return to work until the next regular semester after her child is three months old was violative of due process as both arbitrary and irrational, *id.* at 648–50, 94 S.Ct. 791, while a rule permitting a teacher to become eligible for reemployment on submission of a medical certificate from her physician, return to work being guaranteed no later than the beginning of the next school year, was held to be proper, *id.* at 650, 94 S.Ct. 791.

Three Air Force cases and one Navy case have also considered the question of mandatory pregnancy discharge. In the first of these, *Struck v. Secretary of Defense,* 460 F.2d 1372 (9th Cir. 1971), *cert. granted,* 409 U.S. 947, 93 S.Ct. 292, 34 L.Ed.2d 217, *vacated and remanded,* 409 U.S. 1071, 93 S.Ct. 676, 34 L.Ed.2d 660 (1972), it was held that the mandatory discharge rule for pregnant WAFs was constitutional, but the case was vacated and remanded for consideration of the issue of mootness "in light of the position presently asserted by the Government," 409 U.S. at 1071, 93 S.Ct. at 676, after the Air Force ordered Captain Struck's retention in service. Similarly, after the District Court for the District of Columbia upheld the Air Force regulation as to an enlisted WAF in *Gutierrez v. Laird,*

346 F.Supp. 289 (D.D.C.1972), the judgment there was vacated as moot after the Air Force ordered retention of Lt. Gutierrez in service following her appeal to the court of appeals. Unpublished order, D.C.Cir., Feb. 6, 1973 as amended May 8, 1973. *See* Note, *Pregnancy Discharges* 573–74. In *Robinson v. Rand,* 340 F.Supp. 37 (D.Colo.1972), it was held that the Air Force regulation violated substantive due process, 340 F.Supp. at 37, 38,[4] and before the Government's appeal could be decided by the Tenth Circuit the Air Force granted Airman Robinson a waiver. Note, *Pregnancy Discharges* 575–76. *Cook v. Arentzen,* Civ. No. 73–332–N (E.D.Va. Jan. 8, 1976), upheld an armed services mandatory discharge regulation on grounds similar to the district court below. As matters now stand, then, the order in the court below and the *Cook* case are the only two presently outstanding which have upheld such a regulation. In the interests of closer analysis, unlike *Struck, Gutierrez, Robinson, Cook* or the decision below, we will confront initially the issue of reviewability—the general question whether a court should interfere with the military's regulation of its own affairs— rather than to treat of that issue in addition to the interest in military efficiency and administrative convenience in weighing the merits of the particular regulation at issue. In other words, the threshold question is whether the courts have any business at all concerning themselves with the basic issue of armed services' rules relating to pregnancy. *See* Note, *Pregnancy Discharges* 579–80. The substantive issue is whether indeed the particular mandatory discharge regulation is constitutionally valid, which will be treated separately.

## III. REVIEWABILITY

It is doubtless true that the relationship of the Government to the members of the

---

4. This was, as Note, *Pregnancy Discharges* 576, suggests, a "rather extraordinary approach." *See* Gunther, *The Supreme Court, 1971 Term— Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 41–43 (1972) (ad-

vocating equal protection analysis as means-focused rather than due process as ends-focused). *See Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 111, 69 S.Ct. 463, 93 L.Ed. 533 (1949) (Jackson, J., concurring).

military is different in many respects from that to civilian employees. In a decision upholding the Uniform Code of Military Justice in the face of void for vagueness and overbreadth arguments, the Supreme Court in *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), spoke of the differences between the military and civilian communities, pointing out that there is simply not the same autonomy in the former as in the latter, and that in respect to the military establishment the Government is often "employer, landlord, provisioner and law giver rolled into one." *Id.* at 751, 94 S.Ct. at 2559. So, too, in *Schlesinger v. Ballard, supra*, 419 U.S. at 510, 95 S.Ct. at 578, in holding a longer term of service without promotion for female Naval officers to be constitutional,[5] the Court pointed out that the "responsibility for determining how best our armed forces shall attend to [the] business [of fighting or being ready to fight wars should the occasion arise] rests with Congress . . . and with the President." Both of these recent cases cited, with apparent approval, *Orloff v. Willoughby*, 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953), where, in a case involving the revision of duty orders of one present lawfully in the service, the Court cautioned against the judiciary's interference with legitimate Army matters. Traditionally, the courts have been quite reluctant to review or intervene in matters concerning the military.

 At the same time, a succession of cases in this circuit and others has reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications. For example, both the First and Fourth Circuits have allowed review of discharge petitions where there were constitutional rights at issue. *Ashe v. McNamara*, 355 F.2d 277 (1st Cir. 1965) (dishonorable discharge appealed); *Reed v. Franke*, 297 F.2d 17 (4th Cir. 1961). *See also Hammond v. Lenfest*, 398 F.2d 705 (2d Cir. 1968) (conscientious objector discharge sought). A line of cases in our court holds that actions by the armed services that are violative of their own regulations are within the reach of the courts. *Naskiewicz v. Lawyer*, 456 F.2d 1166 (2d Cir. 1972); *United States ex rel. Donham v. Resor*, 436 F.2d 751 (2d Cir. 1971); *Smith v. Resor*, 406 F.2d 141, 145 (2d Cir. 1969). *Cf. Cortright v. Resor*, 447 F.2d 245 (2d Cir. 1971), *cert. denied*, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972); Note, *Judicial Review and Military Discipline—Cortright v. Resor: The Case of the Boys in the Band*, 72 Colum.L.Rev. 1048 (1972). So too, where a military official acts beyond his powers, the federal courts may review matters of internal military affairs. *Harmon v. Brucker*, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958); *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971).

The Government does not contend that its actions are beyond the scope of judicial review. Indeed, two striking examples of the exercise of judicial review of military affairs are *Parker v. Levy, supra*, and *Schlesinger v. Ballard, supra*, where the Military Justice Act upheld in *Levy* and the mandatory discharge statute upheld in *Schlesinger* were both treated on their constitutional merits, albeit with a bow to the "hands off" doctrine of *Orloff v. Willoughby, supra*. *Orloff* itself allowed review of a constitutional claim although it denied the serviceman relief on the merits. To be sure, there is precious little Supreme Court law to tell us which rights clearly held by civilians apply in what circumstances to

---

5. The Court noted that the different treatment resulted not from mere administrative convenience as in *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), and *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). Rather it resulted from the fact that female line officers, because of the restrictions under 10 U.S.C. § 6015 from participating in combat and most sea duty, do not have opportunities for professional service equal to those of male line officers. On this basis, it was held Congress could rationally conclude that a longer period of tenure for women was necessary to give them a fair and equitable career advancement. Any reverse discrimination against male officers was not a denial of equal protection.

members of the military community.[6] The Supreme Court has flatly said, however, that "members of the military community enjoy many of the same rights and bear many of the same burdens as do members of the civilian community . . . ." *Parker v. Levy, supra,* 417 U.S. at 751, 94 S.Ct. at 2559.

Although the Marine Corps does not contend here that its actions are beyond the scope of judicial review, the decision of the trial court on the merits seems to reflect an implicit judgment that such review is improper. The court below in evaluating the rationality of the mandatory discharge rule dwelled on the general considerations of deference due to military discretion regarding treatment of its personnel. Judge Holden first quoted from *Burns v. Wilson,* 346 U.S. 137, 140, 73 S.Ct. 1045, 1048, 97 L.Ed. 1508 (1953):

> [T]he civil courts are not the agencies which must determine the precise balance to be struck in this adjustment [between the "rights of men" and the "demands of discipline and duty"]. . . .

Citing *Orloff, supra,* the Court went on to describe the discharge regulation as a "valid military concern, one in which the judiciary, in the interest of orderly government, should not intrude." 378 F.Supp. at 725.

These considerations of judicial restraint are relevant to the decision to review, but once review commences the "intrusion" into military concerns has in a sense already occurred. To allow this reluctance to review to spill over into the decision on the merits is to presume that the military qua military is endowed with a gift of superior rationality regarding its concededly "valid

military concerns." As the Supreme Court demonstrated in *Schlesinger v. Ballard, supra,* and *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), military treatment of personnel in allowing benefits for "dependents" and in discharging officers for failure to achieve promotion is subject to judicial review and to constitutional requirements even though such treatment may equally be a "valid military concern."

■ In the light of *Levy, Ballard,* and *Frontiero* we find there to be no basis for a judicial deference to the military here which precludes review of appellant's substantive constitutional claims. At issue is "one of the liberties" the Supreme Court has declared to be long recognized as protected by the Constitution: "freedom of personal choice in matters of marriage and family life . . . ." *Cleveland Board of Education v. LaFleur, supra,* 414 U.S. at 639, 94 S.Ct. at 796. Furthermore, appellant's claims must be evaluated in relation to the specific military justifications alleged here—the demands of readiness, mobility and administrative convenience—without unjustified presumptions of validity for either competing interest given in our inquiry on the merits, without a two-tier standard, so to speak.

## IV. THE MERITS

■ A. *Equal Protection.* We believe the regulations here challenged to be invalid both on equal protection and on due process grounds. As to equal protection[7] we are fully aware that the Supreme Court has yet to treat sex classifications as demanding "strict scrutiny" under the basic

---

6. *Cf. Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866); *In re Grimley,* 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890); *Johnson v. Sayre,* 158 U.S. 109, 15 S.Ct. 773, 39 L.Ed. 914 (1895); *Duncan v. Kahanamoku,* 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1948); *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955); *O'Callahan v. Parker,* 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). *See general-*

*ly Mindes v. Seaman,* 453 F.2d 197, 199–201 (5th Cir. 1971).

7. The equal protection clause is applicable to the federal government under the due process clause of the Fifth Amendment. *Bolling v. Sharp,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). *See Schlesinger v. Ballard,* 419 U.S. 498, 500 n.3, 95 S.Ct. 512, 42 L.Ed.2d 610 (1975).

two-tiered test.[8] Rather, the Court continues to find it "unnecessary to decide" whether a classification based on sex is inherently suspect, *Stanton v. Stanton,* 421 U.S. 7, 13, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), and continues to refer to the rationality test, to the effect that a classification "must rest upon some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989, 990 (1920), *quoted in Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). Pregnancy classifications have not in other circumstances been subjected to strict scrutiny. Compare *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974) (exclusion of pregnancy from coverage by state health insurance), and *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), with *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

■ The question here is not whether it is rational to classify personnel under the temporary disability of pregnancy as subject to mandatory discharge, while not classifying those personnel free from disability similarly.[9] The questions are, rather, whether it is rational to classify pregnant personnel differently from personnel with all other temporary disabilities, and whether there is "some ground of difference" between the two classifications which bears a substantial relation to the purposes of

mobility, readiness and administrative convenience.

Following the analysis of *Green v. Waterford Board of Education, supra,* and of Mr. Justice Powell concurring in *Cleveland Board of Education v. LaFleur, supra,* 414 U.S. at 651, 653, 655, 94 S.Ct. 791, it would seem that the Marine Corps' differentiation between the disability of pregnancy on the one hand and all other temporary disabilities [10] on the other is irrational.

The Marine Corps may have a legitimate and important interest in insuring the general mobility and readiness of its personnel, but the mandatory discharge rule here is simply not constitutionally tailored to promote this interest by ridding the Corps of all members whose physical condition makes them potentially unable "to respond to an emergency assignment at a distant station without proper attention to [his or her] physical well-being . . . ." 378 F.Supp. at 725. The regulation as a tool for insuring mobility and readiness is applied in a manifestly underinclusive fashion. As the district court found, at the time of appellant's discharge pregnancy was the lone disability subjected to the rather drastic treatment of mandatory discharge. The Marine Corps left all other temporary disabilities, which undeniably undermined the ability of all personnel to respond like quicksilver to duty's call, free from the mandatory discharge "solution." As this court said in regard to a school board's mandatory maternity leave rule, allegedly justified as being for the protection of the health of pregnant teachers,

the only disability which results in parenthood is immaterial since the mandatory discharge regulation applied solely to pregnant women rather than to any woman wishing to keep her child after birth, or to any individual about to become a parent. Of course, if the woman who gives birth to a child would prefer to be with the child rather than to perform her service duties, it would be simple enough to grant her a discharge at her request, and indeed this is presently the Corps' procedure, *see* note 1 *supra.*

---

8. *See Gunther,* note 4 *supra,* at 29–30.

9. Were such a classification at issue, there would still be a policy argument as to whether mandatory discharge would not in fact *reduce* combat readiness by increasing turnover rates and wasting personnel, disrupting existing units and production teams. *See, Struck v. Secretary of Defense,* 460 F.2d 1372, 1377 (9th Cir. 1971); *Note, Pregnancy Discharges* 589.

10. The physical disability of the pregnant woman is temporary only. *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). The fact that pregnancy is

Why the Board should choose, by means of an inflexible rule, to manifest particular concern with the health of a pregnant woman, but not, for example, with the health of a teacher (male or female) recuperating from a heart attack is nowhere explained.

*Green v. Waterford Board of Education, supra,* 473 F.2d at 634–35. Why the Marine Corps should choose, by means of the mandatory discharge of pregnant Marines, to insure its goals of mobility and readiness, but not to do so regarding other disabilities equally destructive of its goals, is subject to no rational explanation.

██ On one scale, the mandatory discharge regulation is irrationally underinclusive, since it does not apply to personnel with any other temporary disabilities. On yet another scale, the regulation is irrationally overinclusive because it operates to discharge pregnant Marines automatically, whenever they are discovered to be pregnant, without any individualized determination of their fitness to serve. In doing so the regulation goes beyond even the mandatory leave rules in *Green* and *LaFleur* which established presumptive cut-off dates of four or five months of pregnancy as signaling physical incapacity to work as a classroom teacher. The Marine Corps regulation establishes a presumption of unfitness for work at all posts, in appellant's case as a clerk typist, as of the earliest possible date of pregnancy diagnosis and forever more. This classification of presumed unfitness is patently overinclusive since it operates to expel not only those Marines who are suffering the limited period of disability in the days or weeks surrounding the date of childbirth but also many Marines who, given an individualized determination of their fitness to serve, would undoubtedly be found capable of continued service for several weeks more before giving birth and possibly years after.

██ The third justification advanced for the regulation, the administrative convenience of "knowing where your people are and their capacity to respond," is also not rationally supported by means of the discharge regulation. Pregnancy in the majority of cases involves a disability limited in term, with advance notice of its onset, and the period of time during which a temporary leave or light duty would be required for a pregnant Marine is usually readily estimable. *See Heath v. Westerville Board of Education,* 345 F.Supp. 501, 506 (S.D.Ohio 1972); *Williams v. San Francisco Unified School District,* 340 F.Supp. 438, 445 (N.D.Cal.1972). Accidents, sudden illnesses and other temporary disabilities must pose certainly the same if not more of an administrative problem in terms of the certainty of diagnosis of personnel's continuing "capacity to respond." Yet the Marine Corps does not consider it an administrative inconvenience to refrain from discharging Marines with more unpredictably temporary disabilities than that of pregnancy; instead they receive individualized treatment.

As we pointed out in *Green v. Waterford Board of Education, supra,* 473 F.2d at 636, the Supreme Court very clearly held in *Reed v. Reed, supra,* that the state interest of administrative convenience in avoiding the elimination of individual hearings was insufficient to justify an otherwise irrational statutory differentiation of the sexes. The Corps itself and other branches of the armed services presently treat pregnancy like other temporary disabilities which require individualized determinations for treatment.[11] Nonpregnant women Marines may not be given overseas assignments

---

11. *See* note 1 *supra,* regarding current Marine Corps procedure. Other branches have instituted retention procedures whereby the military may waive the discharge of pregnant women. AR 635–200 (21 June 1972) (Army Enlisted Personnel); NPM 3850220(2) (October 1972) (Navy Enlisted Personnel). Air Force regulations, like current Marine Corps regula-

tions, provide that the status of a pregnant service woman is not affected on account of pregnancy unless discharge is requested by the woman herself. AFM 39–10 (immediate action changes 19 March 1975) (Air Force Enlisted Personnel). Whether similar revisions may have been made since 1972 in Army and Navy

without volunteering, nor, as we noted, *supra,* are they assigned to combat duty. Also, prenatal, postnatal and child day care facilities are provided at many Marine Corps bases, including appellant's assigned base. It is thus evident that the mandatory discharge regulation was not calibrated selectively to eliminate Marines whose chosen continuing motherhood after birth created insuperable defects in their "capacity to respond."

In short, we can regard the regulation here only as one based on unsubstantiated generalizations about the sexes, in the class of those "archaic and overbroad" premises which have been rejected as unconstitutional in a host of recent decisions. For example, the proposition that male workers' earnings are vital to the support of their families while the earnings of female wage earners do not significantly contribute to their families' support was given short shrift in *Weinberger v. Wiesenfeld,* 420 U.S. 636, 643, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975). Likewise in *Frontiero v. Richardson, supra,* 411 U.S. at 689, 93 S.Ct. 1764, the Court found unsubstantiated the empirical assertion that female spouses of service men would normally be dependent upon their husbands while male spouses of service women would not. And the "old notion" that the female is destined solely for the home and the rearing of the family and the male only for the marketplace and the world of ideas was given no basis in current reality by the Court in *Stanton v. Stanton, supra,* 421 U.S. at 14–15, 95 S.Ct. 1373. *See also Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (a system of jury selection effectively excluding all women held to violate Sixth Amendment).

Not the least of these outmoded generalizations are the taboos inherent in connection with pregnancy, whether as a result of

Victorian embarrassment at its physical manifestation or of a presumption of physical incapacity. Pregnancy as such is no longer, as this court has said, a dirty word. *See Green v. Waterford Board of Education, supra,* 473 F.2d at 635. And, as the Court observed in striking down the broad presumption that pregnancy creates inevitable physical incapacity to teach within five or six months of its inception, "the ability of any particular pregnant woman to continue to work past any fixed time in her pregnancy is very much an individual matter." *Cleveland Board of Education v. LaFleur, supra,* 414 U.S. at 645, 94 S.Ct. at 799.

 ■ B. *Due Process.* We recognize that five of the nine members of the Court in *Cleveland Board of Education v. LaFleur* adopted a due process analysis in overturning the mandatory pregnancy leave regulations there in issue, rather than the equal protection analysis we have discussed. Only the other day, the Supreme Court reaffirmed its *LaFleur* analysis in holding that state unemployment benefits may not be denied to pregnant employment seekers according to irrebuttable statutory presumptions of their incapacity to work past certain dates. *Turner v. Department of Employment Security,* 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181, 44 U.S.L.W. 3298 (1975). Following a line of cases which included *Vlandis v. Kline,* 412 U.S. 441, 446, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), and *Stanley v. Illinois,* 405 U.S. 645, 654, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the majority held in *LaFleur* that the Due Process clause requires an "individualized determination" as to fitness to work, 414 U.S. at 645, 94 S.Ct. 791, on the basis that "permanent irrebuttable presumptions have long been disfavored," *id.* at 644, 94 S.Ct. at 798.[12] Under this analysis the Marine Corps regulation here estab-

regulations has not been brought to our attention.

12. This analysis has been criticized in Note, *Irrebuttable Presumptions: An Illusory Analysis,* 27 Stan.L.Rev. 449 (1975); Note, *The Irrebuttable Presumption Doctrine in the Supreme Court,* 87 Harv.L.Rev. 1534 (1974). *See also The Supreme Court, 1974 Term,* 89 Harv.L.Rev. 77–85 (1975). *But see* Note, *Irrebuttable Presumptions as an Alternative to Strict Scrutiny: From Rodriguez to LaFleur,* 62 Geo.L.J. 1173 (1974).

lished an irrebuttable presumption that any pregnant female in the Marine Corps is permanently unfit for duty. Such a presumption constitutes a heavy burden on the exercise of the individual's protected freedoms of personal choice in matters of marriage and family life, freedoms protected by the Due Process clause of the Fourteenth Amendment. *See Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); cases cited in *Cleveland Board of Education v. LaFleur, supra,* 414 U.S. at 640, 94 S.Ct. 791. Plainly, however, it is not in the interest in sexual privacy but rather in the freedom to decide whether to procreate that there lies a constitutionally cognizable right. *See Eisenstadt v. Baird, supra. See also Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

■ Here, we commence with the premise that one does not have a constitutional right to remain in the armed services. *Reeves v. Ainsworth,* 219 U.S. 296, 31 S.Ct. 230, 55 L.Ed. 225 (1911); *Schustack v. Herren,* 234 F.2d 134, 135 (2d Cir. 1956). But the Marine Corps, instead of taking an individualized approach to the disability of pregnancy, established a general rule that seriously affects the ability of women Marines who are physically able to be mobile and ready and for personal or religious reasons care to give birth and give a child away for adoption or to a willing family or husband for on-duty care. Like the pregnancy leave regulations in *LaFleur,* the mandatory discharge regulation is overbroad and overly restrictive because it penalizes the decision to bear a child by those Marines whose mobility and readiness would not be reduced, either during most months preceding birth or during their careers after birth. The Marine Corps' general rule may also be counterproductive because the penalty of discharge can lead

women to ignore or conceal pregnancy as long as possible to avoid diagnosis and discharge.

■ The case is one of those which, as Justice Marshall pointed out in his concurring opinion in *United States Department of Agriculture v. Murry,* 413 U.S. 508, 519, 93 S.Ct. 2832, 2838, 37 L.Ed.2d 767, 776 (1973), "combines elements traditionally invoked in what are usually treated as distinct classes of cases, involving due process and equal protection." As Justice Marshall said, in this type of case "we must assess the public and private interests affected by a statutory classification and then decide in each instance whether individualized determination is required or categorical treatment is permitted by the Constitution." *Id.* Professor Lawrence H. Tribe has elaborated on this theme, calling the category of constitutional limitation that of "structural due process." Tribe, *Structural Due Process,* 10 Harv.Civ.Rights-Civ.Lib.L.Rev. 269 (1975). On this basis while the Marine Corps may as a matter of substantive policy constitutionally be given ample latitude to discharge an employee for pregnancy, as for any other disability where mobility and readiness or ability to perform work is likely to be impaired for any substantial period of time, the area appears to be one where the military policy formulation and application is constitutionally required to take the form of individual decision making since the ability of the individual employee to cope with the needs of the job is dependent upon her individual abilities. *See* Tribe, *supra,* at 290–91. Motherhood in the context of the discharge of an unwed mother from high school, as considered by Professor Tribe, is an area in which the need to reflect rapidly changing norms affecting important interests in liberty compels an individualized determination, one not bound by any preexisting rule of thumb within the zone of moral change. *Id.* at 307. On this analysis no different result would obtain in the context of motherhood in the armed services.

Whether we adopt the equal protection analysis of *Green v. Waterford Board of*

*Education* and Mr. Justice Powell,[13] the irrebuttable presumption analysis of the majority in *LaFleur* or the structural due process analysis of Mr. Justice Marshall and Professor Tribe, the same result of unconstitutionality of the mandatory discharge regulation is required.

## V. RELIEF

This decision, coming more than five years after appellant's discharge pursuant to an unconstitutional regulation, presents somewhat difficult problems as to the relief to be awarded.[14] Appellant sought below both a declaratory judgment and a writ in the nature of mandamus compelling reinstatement in the Marine Corps; she seeks the same relief here, *but see* note 18 *infra,*

together with an order for a hearing "to determine the pay, benefits, and emoluments due [her] to fully compensate her for the wrongful discharge."

▇▇▇▇▇ Certainly no problem is posed by our directing the trial court's entry of an order declaring the challenged regulation to be unconstitutional in accordance with our opinion.[15] The remedy at law for damages, however, appears wholly adequate relief in respect to the request for an order compelling reinstatement for the limited purpose of finishing out the approximately 20 months of tenure remaining to be served after appellant's discharge.[16]

In remanding to the trial court for a hearing on the damages to be awarded,[17]

**13.** *See also* Note, *Pregnancy Discharges* 583–93.

**14.** In the other military cases Captain Struck lost her suit for an injunction to prevent her discharge, but was subsequently reinstated by the Air Force. *Struck v. Secretary of Defense,* 460 F.2d 1372 (9th Cir. 1971), *cert. granted,* 409 U.S. 947, 93 S.Ct. 292, 34 L.Ed.2d 217, *vacated and remanded,* 409 U.S. 1071, 93 S.Ct. 676, 34 L.Ed.2d 660 (1972). Lieutenant Gutierrez received a preliminary injunction preventing her discharge, lost her suit for a permanent injunction, *Gutierrez v. Laird,* 346 F.Supp. 289 (D.D.C.1972), but later received retention by the Air Force. Note, *Pregnancy Discharges* 574. Airman Robinson received a preliminary injunction preventing her discharge, and summary judgment was subsequently granted in her favor, although whether for a declaratory judgment or a permanent injunction against her discharge does not appear. *Robinson v. Rand,* 340 F.Supp. 37 (D.Colo.1972).

**15.** Mandamus jurisdiction udner 28 U.S.C. § 1361 "permits flexibility in remedy," so that injunctive and declaratory relief are not inconsistent with its jurisdictional basis. *Burnett v. Tolson,* 474 F.2d 877, 883 & n. 10 (4th Cir. 1973); *see Brown v. Schlesinger,* 365 F.Supp. 1204, 1206–07 (E.D.Va.1973). *See also* Byse & Fiocca, *Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action,* 81 Harv.L.Rev. 308, 350–51 (1967). *But see Prairie Band of Pottawatomie Tribe of Indians v. Udall,* 355 F.2d 364, 367 (10th Cir.), *cert. denied,* 385 U.S. 831, 87 S.Ct. 70, 17 L.Ed.2d 67 (1966).

**16.** In a suit in the nature of mandamus under 28 U.S.C. § 1361 the performance of a constitu-

tional duty may be enjoined where no other relief is available. *See Burnett v. Tolson,* 474 F.2d 877 (4th Cir. 1973); *Carter v. Seamans,* 411 F.2d 767, 773 (5th Cir. 1969), *cert. denied,* 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970). It does not appear that appellant planned to apply for further extensions of her once already extended term of service, or if she had applied whether any extensions would have been accorded her. Therefore the district court's consideration of the relief to be awarded will be focused presumably only upon appropriate compensation for the approximately 20-month term appellant might have served had she not been mandatorily discharged but given an individualized determination of her continuing fitness to serve. There appears to be no reason that back-pay damages calculated according to ordinary principles of damage law would not be adequate relief.

**17.** We assume that in requesting relief in the form of damages appellant recognized that her claim would not exceed $10,000, up to which amount the district court has concurrent jurisdiction with the Court of Claims to award under 28 U.S.C. § 1346(a)(2). *See Carter v. Seamans,* 411 F.2d 767, 771–72 (5th Cir. 1969), *cert. denied,* 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970); *Parrish v. Seamans,* 343 F.Supp. 1087, 1092–93 (D.S.C.1972), *aff'd,* 485 F.2d 571 (4th Cir. 1973). If appellant's claim for damages exceeds $10,000 the district court is without jurisdiction under § 1346(a)(2) to award such damages, and appellant must take this claim for relief to the Court of Claims. *See Carter v. Seamans, supra.*

and other relief if any, two observations are relevant for its consideration.

First, in accordance with the limits of the implications of both the majority and concurring opinions in *LaFleur,* and of our own opinion here, it would seem that the most which may be required of the military is that in appellant's case and in the future (as the regulations now require) an individual determination be made of every pregnant employee's fitness to continue to serve before and after childbirth. Had an injunction to prevent discharge been timely sought and timely obtained, it would have prevented mandatory discharge, but we cannot say that the court would have been justified in affirmatively requiring appellant's retention in the Corps. We cannot, however, turn back the hands of time, and there is no longer any individualized determination relevant to pregnancy to be made by the Corps in appellant's case.

Second, it is not clear from the evidence how the discharge disadvantages appellant in respect of her ability to reenlist now. Appellant attempted to reenlist one month after childbirth, and was denied reenlistment under a regulation which is apparently not challenged independently on this appeal.[18] It does not appear whether this denial owed its origin in any way to the discharge, nor does it appear from the evidence that under present reenlistment regulations some effect flowing directly from the discharge would have hampered or prevented appellant's reenlistment at some later time, or would do so now.

What appellant was realistically denied at the minimum was her salary and other emoluments throughout the remaining service for which she had contracted. Such damages are amenable to calculation on ordinary principles of damage law. If such an award would give appellant a bit of a windfall by virtue of her less than spectacu-

lar service record and weak physical condition during pregnancy, which the Corps has emphasized on appeal, then in effect it is the product of the Corps' own action in discharging appellant pursuant to an arbitrary and unconstitutional regulation. If other damages are claimed we are confident of the district court's ability to handle the situation.

Judgment reversed and remanded with direction to award damages and enter judgment in accordance with this opinion.

MOORE, Circuit Judge (dissenting):

Increasingly has this Court embroiled itself in the daily affairs of our society's many walks of life. Schools, prisons, hospitals—all are supervised in various aspects by our Olympian pronouncements. This case invites us to add to the list the military, in effect, the Army, Navy, Air Force and Marines. I would decline the invitation and respectfully dissent.

## I. THE ORLOFF DOCTRINE

Judicial comity dictates that the lower court should have declined review and dismissed the complaint. This doctrine traces its modern evolution back to the landmark decision, *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). In *Orloff* the petitioner had been inducted into the Army pursuant to a statute authorizing conscription of personnel in certain medical and allied specialist categories. Bringing a habeas corpus suit, he sought to be discharged because after he had been conscripted, he had not been assigned to one of those specialized categories nor given a commission to which he was assertedly entitled by virtue of his qualifications. The court acknowledged that to divert conscriptees from the class of work on the basis of which they had been inducted would raise

---

18. Appellant was denied reenlistment because at the time she had a dependent child. *See* note 3 *supra.* Appellant's brief states, in its statement of the case:

Appellant's rejection for reenlistment is not separately challenged in this appeal because it was a part of the course of events stemming from her unconstitutional discharge. Since this issue was neither briefed nor argued, we take appellant at her word and do not consider the constitutionality of the regulation denying her reenlistment in January, 1971.

questions of unlawful discrimination. *Orloff, supra,* at 88. Nonetheless, the Court refused to either commission or discharge the petitioner and held that the petitioner's challenge of the particular duty assignment was non-reviewable. *Orloff, supra,* at 93. The Court's rationale is the cornerstone of the comity doctrine. It stated:

"[J]udges are not given the task of running the Army . . . The military constitutes a specialized community governed by a separate discipline from that of the civilian.

Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. . . . [W]e cannot go into the discriminatory character of his orders. Discrimination is unavoidable in the Army." *Orloff, supra,* at 94, 73 S.Ct. at 540.

As citizens of a democratic republic, we confront a political paradox that has plagued democracies since Athens. In a perilous world of sovereign nation states, the protection of our civil liberty is, of necessity, entrusted to military institutions which must be rigidly disciplined and authoritarian. Were it not so, no one could predict the jeopardy we would face or whether this great Republic would long survive. Of course, neither sphere exists free of the influence of the other. The same citizens who enjoy the blessings of liberty as civilians defend it as soldiers. But it is equally obvious that neither sphere can be forced into a common mold. These considerations are the foundation of the principle of non-reviewability and mandate its application to this case. We should sit as judges of matters appropriately within our limited jurisdictional domain, not as generals ruling upon matters unsuited to our expertise.

Specifically, I dissent from the assumption by the judiciary of a power to nullify and declare unconstitutional regulations of the Marine Corps designed to regulate the conduct of those admitted for enlistment and with which by their acceptance into the Corps all enlistees had to comply. I find no justifiable application of the constitutional principles of "due process" and "equal protection" to the facts of this case. Those who seek military careers are forced to forego many constitutional rights. For example, a civilian has a First Amendment right to stand on a street corner and publicly decry the evils of the Vietnam War. But that same person in the Corps on the verge of an ordered attack on a machine gun nest would scarcely have the right to protest and urge withdrawal of the order because he felt that the war was wrong. When this appellant chose to leave her civilian status and become "Semper Fidelis" to her country and the Corps, she voluntarily altered her rights and privileges.

## II. CASES RELIED UPON BY THE MAJORITY ARE INAPPOSITE

None of the limited exceptions to the judicial comity doctrine to which we are referred by the majority have any relevance to this case. This case does not present a challenge to military regulations intended to benefit the allegedly grieved party. *Compare, e. g. Naskiewicz v. Lawver,* 456 F.2d 1166 (2d Cir. 1972). Appellant does not claim that the military has violated a regulation which it originally adopted of its own volition. *Compare, e. g. Smith v. Resor,* 406 F.2d 141, 145 (2d Cir. 1969). Nor does this case involve the imposition of quasi-criminal penalties of court martials or less than honorable discharges. *Compare, e. g., Ashe v. McNamara,* 355 F.2d 277 (1st Cir. 1965); *cf. Hammond v. Lenfest,* 398 F.2d 705 (2d Cir. 1968) ("[P]etitioner's challenge, in reality, [was] to a determination of the Selective Service System, not the military" p. 714).

Equally inapposite are the cases which arose in a purely non-military context that are relied upon by the majority in its discussion of the merits. Of no precedential value are the cases mostly involving the pregnancy of married school teachers; see *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52

(1974); *Green v. Waterford Board of Education*, 473 F.2d 629 (2d Cir. 1973); or monetary benefits; *see Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

Nor in my opinion is it the function of this Court (or any other) to remold the views of society with respect to pregnancy. Assuming that we no longer have "Victorian embarrassment at its [pregnancy's] physical manifestation" and that many school teachers have the physical capacity to teach up until almost the last moment, these facts have no bearing upon the requirements of the military. The majority would protect appellant in her "personal choice in matters of marriage and family life," but her personal choice was to enlist in the Marine Corps, to subject herself to its regulations. We have not as yet elevated the right to sexual enjoyment to a constitutional level, even though an expansive interpretation might categorize it as "the pursuit of happiness". In my opinion, a woman who is "physically able to be mobile and ready" and who for personal reasons cares to "give birth and give a child away for adoption" does not have a constitutional right to use the Corps for this activity.

The majority say that the regulation against pregnancy is unconstitutional because "it penalizes the decision to bear a child by those Marines whose mobility and readiness would not be reduced, neither during most months preceding birth nor during their careers after birth". This assumption is belied by the condition of appellant herself who during the early months of pregnancy and before its discovery had reported to the base infirmary on 18 occasions, complaining of nausea, fainting, abdominal pains and fatigue—rather normal pregnancy symptoms. Daily policing of barracks at 0600 and 0730 for duty, might well present problems, but her participations in formations might be even more disconcerting to the drill sergeant. In open barracks a special crib and normal baby crying might be somewhat disturbing to the nightly rest of the others and the necessitous abandonment of work for the nursing period would be equally disruptive. In short, the majority would have the Marine Corps adapt itself and facilities to a day and night baby care center instead of having appellant adapt herself to the known regulations of the Corps.

## III. RELIEF

An equally disturbing aspect of the majority approach is the remedy which it fabricated. Even assuming that it were appropriate to ignore the military context which permeates this controversy, no court has ever gone so far as the majority does today. In a case relied upon by the majority, it was flatly declared that a claim to enjoin the Navy from discharging its personnel would be frivolous and would not provide a basis for the court's jurisdiction to interfere with normal operations of the military. *Reed v. Franke*, 297 F.2d 17, 20 (4th Cir. 1961). However, appellant's claim and the remedy constructed by the majority is nothing less than the monetary equivalent of appellant's reinstatement. Under *Reed*, this claim is not reviewable *a fortiori*. The remedy infringes a particularly vital military concern—the ability to control personnel requirements within the bounds of the resources allotted by Congress. At most, sick leave could have covered the period from May to December 1970. The regulations prohibiting her retention in the Corps after the baby had been born is not challenged; hence her discharge and denial of re-entry were lawful.

## IV. EXHAUSTION OF REMEDIES

Moreover, in its headlong rush to reach the merits, the majority has overlooked the appellant's failure to exhaust intraservice remedies If the exhaustion requirements could fairly be characterized as a procedural snare to deprive citizens of meritorious claims, I would not be heard to object. But the requirement is a salutary principle of judicial administration which minimizes the

**1130**

Federal judiciary's interference with the affairs of other governmental institutions by providing them with the initial opportunity to review claims involving their regulations and special expertise.

Even if this case arose in a purely non-military context we could not sidestep this principle. When we are asked to strike down a Marine regulation governing its treatment of disabled soldiers, the necessity of considering whether the affected soldier has in the first instance presented her grievance to the Marines is beyond cavil. This is confirmed by the holding of yet another case relied upon by the majority where the court cautioned that the merits of claims involving the armed services should not be reviewed unless all available intraservice remedies have been exhausted. *Mindes v. Seaman*, 453 F.2d 197, 201 (5th Cir. 1971).

Appellant offered no objection to her discharge. Nor did she apply for a waiver of the then applicable regulations which precluded her re-enlistment. The majority believes that no significance was attributed to her failure to raise objection "because she wanted to remain in the Marine Corps." This apologia strikes me as strained. If she wanted to remain in the Marines so badly, she should have complained when she was released. But regardless of what appellant's motive for disregarding intraservice procedures might have been, the question is not why appellant failed to take advantage of available avenues of review, but whether or not she did.

At the time of her discharge, appellant was entitled to a mandatory hearing before the Marines Discharge Review Board. This Board was empowered to recommend changing the type of discharge or eliminating the discharge and restoring the party to his or her prior duty and rank. The Secretary of the Navy would then pass upon the recommendation. 22 F.R. 3436 (1957) as amended 26 F.R. 12660 (1961).[1]

Even today, she could still petition this Board to change her discharge in light of

> "other standards differing [in appellant's favor from those requiring her discharge], not having been made expressly retroactive, were subsequently made generally applicable on a service-wide basis to separations of the type and character received by the petitioner." 32 C.F.R. 724.32 (1975).

This provision expressly covers appellant's situation.

Additionally, up to three years after her discharge, appellant might have petitioned the Board of Correction of Naval Records, which is empowered to correct any military record to remove an injustice or correct any error. 10 U.S.C. § 1552(a) (1975). Indeed, this review may still be available because that Board is empowered to waive its three year statute of limitations; 32 C.F.R. 723.-(3)(b) (1975). This Board has authority to initiate action at a higher administrative level which could result in reinstatement. 32 C.F.R. § 723.7 (1975).

Furthermore, appellant could have sought review after she was denied re-enlistment. She could have applied for a waiver, and if that was denied, review of the decision would have been available

1. Five years after appellant's discharge, the Board's procedural regulations were further amended to prohibit recommendations for re-enlistment. 32 C.F.R. 724.33 (1975). In light of the language it is uncertain whether the Board retains authority to recommend reinstatement. In such circumstances, exhaustion of remedies is required to permit the Board to determine the scope of its remedial powers. *Bolger v. Marshall*, 90 U.S.App.D.C. 30, 193 F.2d 37, 39 n.5 (1951).

Even on the assumption that the Discharge Board was stripped of this power when the regulations were amended, such relief was, nonetheless, available to appellant for almost five years after her discharge. The *Fay v. Noia* doctrine which ascertains the availability of remedies at the time of the institution of a habeas petition has not been adopted in the military context *even in cases involving court martial convictions.* See, Sherman, *Judicial Review of Military Determinations and the exhaustion of Remedies Requirement*, 55 Va.L. Rev. 483, 501 (1969). Even if *Fay v. Noia* were applicable to this case, review was still available at the time of commencement of this action. *See* text, *infra.*

through the same military channels which encompass her discharge grievance.

From among all these available procedures, appellant chose not one. To characterize this as a matter of "knowing" waiver, I believe misstates the issue. By dismissing the complaint we would not be depriving appellant of any claims; we would merely be directing her to first seek out the forum to which she had always had access. Simultaneously, we would effectuate the principles so ably expressed in *Orloff* and prevent unnecessary civilian interference in military matters by insuring military autonomy over its own business. Furthermore, by requiring utilization of available military forums, this Court might ultimately have been relieved of the necessity to delve into the constitutional issues. *Reed v. Franke, supra,* at 27. This is especially pertinent in this case where military review of appellant's situation is expressly contemplated by regulation. In such circumstances, to uphold jurisdiction merely because the complaint alleges the deprivation of an allegedly constitutional right, is unwarranted.

As far as the interest in military autonomy is concerned, dismissing a complaint on the ground that judicial interference should be limited or upholding a regulation after discounting the challenge to reflect the armed services unique concerns, causes the same impact. In *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), the Court without disapproving *Orloff* seemed to adopt the latter approach. In reviewing a First Amendment vagueness claim, it stated:

"While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it." *Parker, supra,* at 758, 94 S.Ct. at 2563.

Similarly, the Court in *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 512, 42 L.Ed.2d 610 (1975), in upholding the challenged statute on the merits, factored into its analysis the interests of military autonomy as articulated in *Orloff. Schlesinger, supra,* at 510.

The interest of allowing the military to have the initial opportunity to arrange its own affairs must be considered at some point. I believe that the majority has sidestepped the question with assurances that the Government does not contend [*on appeal*] that its actions are beyond the scope of judicial review. That more is required is demonstrated most emphatically in *Bolger v. Marshall,* 90 U.S.App.D.C. 30, 193 F.2d 37 (1951).

In *Bolger,* a former enlisted member of the Women's Army Corp sought a declaratory judgment restoring her status as a Corp member and for relief in the nature of mandamus vacating her discharge and restoring her to her former rank. She had been honorably discharged and had initiated suit after seeking relief from the Army Board for Correction of Military Records. Even though it was then unclear whether the Army Discharge Review Board could grant the relief requested, the court affirmed the dismissal of the complaint for failure to exhaust that additional intraservice remedy. The Court observed:

"Appellees' failure to contest the allegation of exhaustion cannot foreclose us from inquiry into it since exhaustion is a matter which involves the District Court's authority to entertain the suit—whether because it is a jurisdictional prerequisite or the result of a 'long-settled rule of judicial administration.'" *Bolger, supra,* at 39.

*A fortiori* where appellant has not sought review before any Board.

I would affirm.