LOVING ET UX. *v.* VIRGINIA.

No. 395.   Argued April 10, 1967.—Decided June 12, 1967.

*Bernard S. Cohen* and *Philip J. Hirschkop* argued the cause and filed a brief for appellants.   *Mr. Hirschkop* argued *pro hac vice,* by special leave of Court.

*R. D. McIlwaine III,* Assistant Attorney General of Virginia, argued the cause for appellee.   With him on the brief were *Robert Y. Button,* Attorney General, and *Kenneth C. Patty,* Assistant Attorney General.

*William M. Marutani,* by special leave of Court, argued the cause for the Japanese American Citizens League, as *amicus curiae,* urging reversal.

Briefs of *amici curiae,* urging reversal, were filed by *William M. Lewers* and *William B. Ball* for the National Catholic Conference for Interracial Justice et al.;

1

by *Robert L. Carter* and *Andrew D. Weinberger* for the National Association for the Advancement of Colored People, and by *Jack Greenberg, James M. Nabrit III* and *Michael Meltsner* for the N. A. A. C. P. Legal Defense & Educational Fund, Inc.

*T. W. Bruton,* Attorney General, and *Ralph Moody,* Deputy Attorney General, filed a brief for the State of North Carolina, as *amicus curiae,* urging affirmance.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This case presents a constitutional question never addressed by this Court: whether a statutory scheme adopted by the State of Virginia to prevent marriages between persons solely on the basis of racial classifications violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment.[1] For reasons which seem to us to reflect the central meaning of those constitutional commands, we conclude that these statutes cannot stand consistently with the Fourteenth Amendment.

In June 1958, two residents of Virginia, Mildred Jeter, a Negro woman, and Richard Loving, a white man, were married in the District of Columbia pursuant to its laws. Shortly after their marriage, the Lovings returned to Virginia and established their marital abode in Caroline County. At the October Term, 1958, of the Circuit Court

---

[1] Section 1 of the Fourteenth Amendment provides:

"All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

of Caroline County, a grand jury issued an indictment charging the Lovings with violating Virginia's ban on interracial marriages. On January 6, 1959, the Lovings pleaded guilty to the charge and were sentenced to one year in jail; however, the trial judge suspended the sentence for a period of 25 years on the condition that the Lovings leave the State and not return to Virginia together for 25 years. He stated in an opinion that:

> "Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with his arrangement there would be no cause for such marriages. The fact that he separated the races shows that he did not intend for the races to mix."

After their convictions, the Lovings took up residence in the District of Columbia. On November 6, 1963, they filed a motion in the state trial court to vacate the judgment and set aside the sentence on the ground that the statutes which they had violated were repugnant to the Fourteenth Amendment. The motion not having been decided by October 28, 1964, the Lovings instituted a class action in the United States District Court for the Eastern District of Virginia requesting that a three-judge court be convened to declare the Virginia antimiscegenation statutes unconstitutional and to enjoin state officials from enforcing their convictions. On January 22, 1965, the state trial judge denied the motion to vacate the sentences, and the Lovings perfected an appeal to the Supreme Court of Appeals of Virginia. On February 11, 1965, the three-judge District Court continued the case to allow the Lovings to present their constitutional claims to the highest state court.

The Supreme Court of Appeals upheld the constitutionality of the antimiscegenation statutes and, after

4

modifying the sentence, affirmed the convictions.[2] The Lovings appealed this decision, and we noted probable jurisdiction on December 12, 1966, 385 U. S. 986.

The two statutes under which appellants were convicted and sentenced are part of a comprehensive statutory scheme aimed at prohibiting and punishing interracial marriages. The Lovings were convicted of violating § 20–58 of the Virginia Code:

> "*Leaving State to evade law.*—If any white person and colored person shall go out of this State, for the purpose of being married, and with the intention of returning, and be married out of it, and afterwards return to and reside in it, cohabiting as man and wife, they shall be punished as provided in § 20–59, and the marriage shall be governed by the same law as if it had been solemnized in this State. The fact of their cohabitation here as man and wife shall be evidence of their marriage."

Section 20–59, which defines the penalty for miscegenation, provides:

> "*Punishment for marriage.*—If any white person intermarry with a colored person, or any colored person intermarry with a white person, he shall be guilty of a felony and shall be punished by confinement in the penitentiary for not less than one nor more than five years."

Other central provisions in the Virginia statutory scheme are § 20–57, which automatically voids all marriages between "a white person and a colored person" without any judicial proceeding,[3] and §§ 20–54 and 1–14 which,

---

[2] 206 Va. 924, 147 S. E. 2d 78 (1966).

[3] Section 20–57 of the Virginia Code provides:
"*Marriages void without decree.*—All marriages between a white person and a colored person shall be absolutely void without any decree of divorce or other legal process." Va. Code Ann. § 20–57 (1960 Repl. Vol.).

respectively, define "white persons" and "colored persons and Indians" for purposes of the statutory prohibitions.[4] The Lovings have never disputed in the course of this litigation that Mrs. Loving is a "colored person" or that Mr. Loving is a "white person" within the meanings given those terms by the Virginia statutes.

---

[4] Section 20–54 of the Virginia Code provides:

*"Intermarriage prohibited; meaning of term 'white persons.'*—It shall hereafter be unlawful for any white person in this State to marry any save a white person, or a person with no other admixture of blood than white and American Indian. For the purpose of this chapter, the term 'white person' shall apply only to such person as has no trace whatever of any blood other than Caucasian; but persons who have one-sixteenth or less of the blood of the American Indian and have no other non-Caucasic blood shall be deemed to be white persons. All laws heretofore passed and now in effect regarding the intermarriage of white and colored persons shall apply to marriages prohibited by this chapter." Va. Code Ann. § 20–54 (1960 Repl. Vol.).

The exception for persons with less than one-sixteenth "of the blood of the American Indian" is apparently accounted for, in the words of a tract issued by the Registrar of the State Bureau of Vital Statistics, by "the desire of all to recognize as an integral and honored part of the white race the descendants of John Rolfe and Pocahontas . . . ." Plecker, The New Family and Race Improvement, 17 Va. Health Bull., Extra No. 12, at 25–26 (New Family Series No. 5, 1925), cited in Wadlington, The *Loving* Case: Virginia's Anti-Miscegenation Statute in Historical Perspective, 52 Va. L. Rev. 1189, 1202, n. 93 (1966).

Section 1–14 of the Virginia Code provides:

*"Colored persons and Indians defined.*—Every person in whom there is ascertainable any Negro blood shall be deemed and taken to be a colored person, and every person not a colored person having one fourth or more of American Indian blood shall be deemed an American Indian; except that members of Indian tribes existing in this Commonwealth having one fourth or more of Indian blood and less than one sixteenth of Negro blood shall be deemed tribal Indians." Va. Code Ann. § 1–14 (1960 Repl. Vol.).

6

Virginia is now one of 16 States which prohibit and punish marriages on the basis of racial classifications.[5] Penalties for miscegenation arose as an incident to slavery and have been common in Virginia since the colonial period.[6] The present statutory scheme dates from the adoption of the Racial Integrity Act of 1924, passed during the period of extreme nativism which followed the end of the First World War. The central features of this Act, and current Virginia law, are the absolute prohibition of a "white person" marrying other than another "white person,"[7] a prohibition against issuing marriage licenses until the issuing official is satisfied that

---

[5] After the initiation of this litigation, Maryland repealed its prohibitions against interracial marriage, Md. Laws 1967, c. 6, leaving Virginia and 15 other States with statutes outlawing interracial marriage: Alabama, Ala. Const., Art. 4, § 102, Ala. Code, Tit. 14, § 360 (1958); Arkansas, Ark. Stat. Ann. § 55–104 (1947); Delaware, Del. Code Ann., Tit. 13, § 101 (1953); Florida, Fla. Const., Art. 16, § 24, Fla. Stat. § 741.11 (1965); Georgia, Ga. Code Ann. § 53–106 (1961); Kentucky, Ky. Rev. Stat. Ann. § 402.020 (Supp. 1966); Louisiana, La. Rev. Stat. § 14:79 (1950); Mississippi, Miss. Const., Art. 14, § 263, Miss. Code Ann. § 459 (1956); Missouri, Mo. Rev. Stat. § 451.020 (Supp. 1966); North Carolina, N. C. Const., Art. XIV, § 8, N. C. Gen. Stat. § 14–181 (1953); Oklahoma, Okla. Stat., Tit. 43, § 12 (Supp. 1965); South Carolina, S. C. Const., Art. 3, § 33, S. C. Code Ann. § 20–7 (1962); Tennessee, Tenn. Const., Art. 11, § 14, Tenn. Code Ann. § 36–402 (1955); Texas, Tex. Pen. Code, Art. 492 (1952); West Virginia, W. Va. Code Ann. § 4697 (1961).

Over the past 15 years, 14 States have repealed laws outlawing interracial marriages: Arizona, California, Colorado, Idaho, Indiana, Maryland, Montana, Nebraska, Nevada, North Dakota, Oregon, South Dakota, Utah, and Wyoming.

The first state court to recognize that miscegenation statutes violate the Equal Protection Clause was the Supreme Court of California. *Perez* v. *Sharp,* 32 Cal. 2d 711, 198 P. 2d 17 (1948).

[6] For a historical discussion of Virginia's miscegenation statutes, see Wadlington, *supra,* n. 4.

[7] Va. Code Ann. § 20–54 (1960 Repl. Vol.).

the applicants' statements as to their race are correct,[8] certificates of "racial composition" to be kept by both local and state registrars,[9] and the carrying forward of earlier prohibitions against racial intermarriage.[10]

## I.

In upholding the constitutionality of these provisions in the decision below, the Supreme Court of Appeals of Virginia referred to its 1955 decision in *Naim* v. *Naim,* 197 Va. 80, 87 S. E. 2d 749, as stating the reasons supporting the validity of these laws. In *Naim,* the state court concluded that the State's legitimate purposes were "to preserve the racial integrity of its citizens," and to prevent "the corruption of blood," "a mongrel breed of citizens," and "the obliteration of racial pride," obviously an endorsement of the doctrine of White Supremacy. *Id.,* at 90, 87 S. E. 2d, at 756. The court also reasoned that marriage has traditionally been subject to state regulation without federal intervention, and, consequently, the regulation of marriage should be left to exclusive state control by the Tenth Amendment.

While the state court is no doubt correct in asserting that marriage is a social relation subject to the State's police power, *Maynard* v. *Hill,* 125 U. S. 190 (1888), the State does not contend in its argument before this Court that its powers to regulate marriage are unlimited notwithstanding the commands of the Fourteenth Amendment. Nor could it do so in light of *Meyer* v. *Nebraska,* 262 U. S. 390 (1923), and *Skinner* v. *Oklahoma,* 316 U. S. 535 (1942). Instead, the State argues that the meaning of the Equal Protection Clause, as illuminated by the statements of the Framers, is only that state penal laws containing an interracial element

---

[8] Va. Code Ann. § 20–53 (1960 Repl. Vol.).

[9] Va. Code Ann. § 20–50 (1960 Repl. Vol.).

[10] Va. Code Ann. § 20–54 (1960 Repl. Vol.).

as part of the definition of the offense must apply equally to whites and Negroes in the sense that members of each race are punished to the same degree. Thus, the State contends that, because its miscegenation statutes punish equally both the white and the Negro participants in an interracial marriage, these statutes, despite their reliance on racial classifications, do not constitute an invidious discrimination based upon race. The second argument advanced by the State assumes the validity of its equal application theory. The argument is that, if the Equal Protection Clause does not outlaw miscegenation statutes because of their reliance on racial classifications, the question of constitutionality would thus become whether there was any rational basis for a State to treat interracial marriages differently from other marriages. On this question, the State argues, the scientific evidence is substantially in doubt and, consequently, this Court should defer to the wisdom of the state legislature in adopting its policy of discouraging interracial marriages.

Because we reject the notion that the mere "equal application" of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations, we do not accept the State's contention that these statutes should be upheld if there is any possible basis for concluding that they serve a rational purpose. The mere fact of equal application does not mean that our analysis of these statutes should follow the approach we have taken in cases involving no racial discrimination where the Equal Protection Clause has been arrayed against a statute discriminating between the kinds of advertising which may be displayed on trucks in New York City, *Railway Express Agency, Inc.* v. *New York*, 336 U. S. 106 (1949), or an exemption in Ohio's ad valorem tax for merchandise owned by a nonresident in a storage warehouse, *Allied Stores of Ohio,*

*Inc.* v. *Bowers,* 358 U. S. 522 (1959). In these cases, involving distinctions not drawn according to race, the Court has merely asked whether there is any rational foundation for the discriminations, and has deferred to the wisdom of the state legislatures. In the case at bar, however, we deal with statutes containing racial classifications, and the fact of equal application does not immunize the statute from the very heavy burden of justification which the Fourteenth Amendment has traditionally required of state statutes drawn according to race.

The State argues that statements in the Thirty-ninth Congress about the time of the passage of the Fourteenth Amendment indicate that the Framers did not intend the Amendment to make unconstitutional state miscegenation laws. Many of the statements alluded to by the State concern the debates over the Freedmen's Bureau Bill, which President Johnson vetoed, and the Civil Rights Act of 1866, 14 Stat. 27, enacted over his veto. While these statements have some relevance to the intention of Congress in submitting the Fourteenth Amendment, it must be understood that they pertained to the passage of specific statutes and not to the broader, organic purpose of a constitutional amendment. As for the various statements directly concerning the Fourteenth Amendment, we have said in connection with a related problem, that although these historical sources "cast some light" they are not sufficient to resolve the problem; "[a]t best, they are inconclusive. The most avid proponents of the post-War Amendments undoubtedly intended them to remove all legal distinctions among 'all persons born or naturalized in the United States.' Their opponents, just as certainly, were antagonistic to both the letter and the spirit of the Amendments and wished them to have the most limited effect." *Brown* v. *Board of Education,* 347 U. S. 483, 489 (1954). See also *Strauder*

v. *West Virginia,* 100 U. S. 303, 310 (1880). We have rejected the proposition that the debates in the Thirty-ninth Congress or in the state legislatures which ratified the Fourteenth Amendment supported the theory advanced by the State, that the requirement of equal protection of the laws is satisfied by penal laws defining offenses based on racial classifications so long as white and Negro participants in the offense were similarly punished. *McLaughlin* v. *Florida,* 379 U. S. 184 (1964).

The State finds support for its "equal application" theory in the decision of the Court in *Pace* v. *Alabama,* 106 U. S. 583 (1883). In that case, the Court upheld a conviction under an Alabama statute forbidding adultery or fornication between a white person and a Negro which imposed a greater penalty than that of a statute proscribing similar conduct by members of the same race. The Court reasoned that the statute could not be said to discriminate against Negroes because the punishment for each participant in the offense was the same. However, as recently as the 1964 Term, in rejecting the reasoning of that case, we stated *"Pace* represents a limited view of the Equal Protection Clause which has not withstood analysis in the subsequent decisions of this Court." *McLaughlin* v. *Florida, supra,* at 188. As we there demonstrated, the Equal Protection Clause requires the consideration of whether the classifications drawn by any statute constitute an arbitrary and invidious discrimination. The clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States. *Slaughter-House Cases,* 16 Wall. 36, 71 (1873); *Strauder* v. *West Virginia,* 100 U. S. 303, 307–308 (1880); *Ex parte Virginia,* 100 U. S. 339, 344–345 (1880); *Shelley* v. *Kraemer,* 334 U. S. 1 (1948); *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961).

There can be no question but that Virginia's miscegenation statutes rest solely upon distinctions drawn according to race. The statutes proscribe generally accepted conduct if engaged in by members of different races. Over the years, this Court has consistently repudiated "[d]istinctions between citizens solely because of their ancestry" as being "odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi* v. *United States,* 320 U. S. 81, 100 (1943). At the very least, the Equal Protection Clause demands that racial classifications, especially suspect in criminal statutes, be subjected to the "most rigid scrutiny," *Korematsu* v. *United States,* 323 U. S. 214, 216 (1944), and, if they are ever to be upheld, they must be shown to be necessary to the accomplishment of some permissible state objective, independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate. Indeed, two members of this Court have already stated that they "cannot conceive of a valid legislative purpose . . . which makes the color of a person's skin the test of whether his conduct is a criminal offense." *McLaughlin* v. *Florida, supra,* at 198 (STEWART, J., joined by DOUGLAS, J., concurring).

There is patently no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification. The fact that Virginia prohibits only interracial marriages involving white persons demonstrates that the racial classifications must stand on their own justification, as measures designed to maintain White Supremacy.[11] We have consistently denied

[11] Appellants point out that the State's concern in these statutes, as expressed in the words of the 1924 Act's title, "An Act to Preserve Racial Integrity," extends only to the integrity of the white race. While Virginia prohibits whites from marrying any nonwhite (subject to the exception for the descendants of Pocahontas), Negroes, Orientals, and any other racial class may intermarry with-

the constitutionality of measures which restrict the rights of citizens on account of race. There can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause.

## II.

These statutes also deprive the Lovings of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment. The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.

Marriage is one of the "basic civil rights of man," fundamental to our very existence and survival. *Skinner* v. *Oklahoma,* 316 U. S. 535, 541 (1942). See also *Maynard* v. *Hill,* 125 U. S. 190 (1888). To deny this fundamental freedom on so unsupportable a basis as the racial classifications embodied in these statutes, classifications so directly subversive of the principle of equality at the heart of the Fourteenth Amendment, is surely to deprive all the State's citizens of liberty without due process of law. The Fourteenth Amendment requires that the freedom of choice to marry not be restricted by invidious racial discriminations. Under our Constitution, the freedom to marry, or not marry, a person of another race resides with the individual and cannot be infringed by the State.

These convictions must be reversed. *It is so ordered.*

---

out statutory interference. Appellants contend that this distinction renders Virginia's miscegenation statutes arbitrary and unreasonable even assuming the constitutional validity of an official purpose to preserve "racial integrity." We need not reach this contention because we find the racial classifications in these statutes repugnant to the Fourteenth Amendment, even assuming an even-handed state purpose to protect the "integrity" of all races.

MR. JUSTICE STEWART, concurring.

I have previously expressed the belief that "it is simply not possible for a state law to be valid under our Constitution which makes the criminality of an act depend upon the race of the actor." *McLaughlin* v. *Florida,* 379 U. S. 184, 198 (concurring opinion). Because I adhere to that belief, I concur in the judgment of the Court.