Adam J. CHLYSTEK and Helen
Chlystek, Plaintiffs,

v.

Rita Wilson KANE, Individually and as
Register of Wills and Ex Officio Clerk of
Court of the Orphans' Court of Alleghe-
ny County, Pennsylvania, Defendant.

Civ. A. No. 75–545.

United States District Court,
W. D. Pennsylvania.

April 30, 1976.

R. Stanton Wettick, Jr., Pittsburgh, Pa., for plaintiff.

Frank W. Jones, Pittsburgh, Pa., for defendant.

## OPINION

DUMBAULD, District Judge.

The male plaintiff in this case like "The Thane of Fife had a wife: Where is she now?"[1] Apparently she is alive and well, whether living in Paris or elsewhere, and has not been done to death by the lawless violence of a Macbeth. It is because she lives that this litigation lives also.

It seems that the matrimonial bond between said wife and male plaintiff was severed at her instance on October 31, 1944, at 229 October Term 1944 in the Court of Common Pleas of Allegheny County, Pennsylvania, on the grounds of adultery between male plaintiff and female plaintiff.

For the last thirty-five years, the complaint alleges, male and female plaintiffs have been cohabiting together as husband and wife, and have raised four children aged from 34 to 26.

Desiring to consecrate their status by ceremonial marriage, in order to assure the wife of Social Security benefits as a widow upon the male husband's death, they apparently sought a license from defendant, the Register of Wills of Allegheny County, Pennsylvania (though this is not alleged in the Complaint, see pars. 14 & 15, using present tense). Apparently the defendant denied the license, relying upon the Act of August 22, 1953, P.L. 1344, 48 P.S. 1–5(h) (although this is also not alleged in the Complaint).

That statute provides: "No license to marry shall be issued by any clerk of the orphans' court:   .   .   .

(h)  To a person divorced by his or her former spouse on the grounds of adultery,

for the marriage of such person to the person with whom the crime of adultery was committed, during the lifetime of the former husband or wife."

Apparently this legislation supersedes the Act of March 13, 1815, P.L. 150, 48 P.S. 169, which reads:

"The husband or wife, who shall have been guilty of the crime of adultery, shall not marry the person with whom the said crime was committed during the life of the former wife or husband; but nothing herein contained shall be construed to extend to or affect or render illegitimate any children born of the body of the wife during coverture."[2]

■ Both statutes refer to "the crime of adultery." It is therefore arguable that the language should be construed as applicable only to cases where criminal prosecution for that crime has resulted in conviction, and the disability to marry may be regarded as a species of supplemental penalty (similar to disqualification to vote, or to testify in court). It is not clear what if any criminal punishment was visited upon adulterers by Pennsylvania law in 1944; but it seems highly improbable that either of the plaintiffs were convicted and sentenced for that offense. Accordingly the statutory provisions may be inapplicable to them, and no constitutional questions presented by the case. But this is basically a question for the State courts to resolve, as is true of matters relating to marriage and divorce in general. *Blank v. Blank*, 320 F.Supp. 1389, 1390–92 (W.D.Pa.1971).

■ Is the instant litigation such that it requires the attention of a three-judge district court? From the unprinted opinion of the Court of Appeals in the instant case [reported at 529 F.2d 511 (Table)] we learn that it is error to deny a three-judge court on the ground that no substantial federal question is presented unless plaintiff's claim

---

1.  Macbeth, Act V, sc. i.

2.  The act of 1815 is repealed "insofar as   .   .   . inconsistent with the provisions of" the act of 1953.  48 P.S. 1–24.  The act of 1953 did not affect common law marriage. 48 P.S. 1–23; *Warrenberger v. Folsom*, 239 F.2d 846, 849 (C.A. 3, 1956).

is frivolous in the sense of being "wholly foreclosed by prior Supreme Court decisions" (p. 4 of unprinted opinion at No. 75–1756, filed December 30, 1975). It remains for us to determine "whether the other conditions precedent to convening a three-judge court were satisfied." (*Ibid.*, p. 5).

For additional guidance as to the requisites for a three-judge court, there is available the able discussion by Judge Leland C. Nielsen,[3] "Three-Judge Courts: A Comprehensive Study," 66 F.R.D. 495–527 (1975); and the excellent address of Judge Walter K. Stapleton,[4] "The State of the Art in Three Judge District Courts" (typewritten address of September 9, 1975, delivered at Third Circuit Judicial Conference in Philadelphia).

■ Among the questions to be passed upon which Judge Stapleton enumerates are federal jurisdiction, standing, case or controversy, mootness, unripeness, controlling non-constitutional questions, the "traditional requisites of equity jurisdiction," statewide applicability of statute, and the doctrine of abstention.

Apart from the above-mentioned questions of statutory interpretation, the principal pertinent issues for consideration from Judge Stapleton's list are those of equity jurisdiction and "whether the action sought to enjoin a state official from executing a statute of statewide application" (p. 5 of unprinted opinion).

■ Undoubtedly a statute of statewide application is involved; and for present purposes it may be assumed *arguendo* that the defendant, although elected locally in Allegheny County as a "row officer" (Register of Wills) is really acting as an agent of the State in applying the statute insofar as "State action" under the Fourteenth Amendment is concerned. If a statute of statewide application is applied in each County by a particularly designated local

official it is still a statewide statute and the separate geographical actions pursuant to it would seem to add up in the aggregate to State action putting the statute into execution.

■ The most difficult question would seem to be whether injunctive relief is necessary. *Majuri v. U. S.*, 431 F.2d 469, 473 (C.A. 3, 1970). This involves the issues of irreparable damage and adequacy of legal remedy. As Judge Nielsen points out, a "basis for equitable and injunctive relief" may be non-existent if "there are adequate remedies at law because adequate state remedies exist" (or because federal declaratory judgment relief may be adequate) [66 F.R.D. at 502].

In this connection it should be noted that, in addition to the appeal at No. 75–1756, from this Court's order denying a three-judge court, there was also at No. 75–1621 an application for mandamus with respect to said order. We are impressed with the reasoning of Judge van Dusen (on behalf of a panel including also Judges Rosenn and Weis)[5] in denying the extraordinary remedy of mandamus:

"Under these circumstances, petitioners would appear to have available to them, *inter alia*, a proceeding under the Pennsylvania Declaratory Judgment Acts, 12 P.S. §§ 831–853, to determine the validity of their marriage and/or the right of the wife-plaintiff to take under the Pennsylvania intestate law  .   .   ."[6]

■ Although the writ of injunction is not so "extraordinary" a remedy as the writ of mandamus, yet the same reasoning (in view of the requirement that an adequate remedy at law must be unavailable in order to warrant equitable relief) would appear to preclude the need for the interposition of equity when the Pennsylvania declaratory judgment procedure, pointed out by Judge van Dusen, would be equally available to plaintiffs as an adequate remedy at law in

3. U.S.D.J., S.D.Calif.

4. U.S.D.J., D.Del.

5. The panel in No. 75–1756 was composed of Judges Seitz, Gibbons, and Rosenn.

6. Page 3 of unprinted opinion at No. 75–1621.

lieu of the federal injunctive relief they seek in the case at bar.

Moreover, federal declaratory judgment relief would be adequate, in view of the unlikelihood that the Social Security administration would disregard the decision of any court of competent jurisdiction.

But the State courts are the more appropriate forum in view of the questions presented involving interpretation of State statutes and public policy.

If the plaintiffs are convinced that the Pennsylvania statute is unconstitutional, then a declaration of the validity of their marriage could be had from the State court.

If they believe that the unconstitutionality of the statute is of recent vintage,[7] and did not exist when they first began marital (as distinguished from meretricious) cohabitation, then they are free to renew their vows in *verba de praesenti* and thus establish a completely valid common law marriage under the force of Pennsylvania law as modified by and subordinated to their newly-minted federal constitutional rights. In any event they have an adequate remedy without injunctive relief from a federal three-judge court.

This conclusion is confirmed by strong reasons of policy. One who seeks nowadays to convene a three-judge court has two strikes against him from the outset.

In the first place, the three-judge procedure was an outgrowth of public sentiment in an era when conditions were utterly different from present-day circumstances.

The procedure arose in the hey-day of the power of railroads and their influence upon public officials. To subvert systems of public utility regulation designed to protect the public from extortionate and discriminatory rates, the railroad magnates turned to a friendly federal judge who granted an injunction against enforcement of the regulatory laws, as being "confiscatory" and resulting in deprivation of property without due process of law.[8]

It is a far cry from those days of railroad dominance to the limping Conrail and Amtrak of our time. It is no longer necessary to convene a three-judge court to prevent a single judge from obstructing a complicated statutory system of public regulation in the public interest at the behest of a powerful corporation.

In the second place, three-judge courts are not only obsolete and outmoded, but are burdensome and inconvenient. Hardly a day passes that Chief Justice Burger does not proclaim, like Cato of old, not *Carthago delenda est* but *curiae trium judicum delendae et tollendae sunt.*[9] For other descriptions of this undue burden on the federal judiciary, see 66 F.R.D. at 526.

Accordingly, we conclude that it is not appropriate to convene a three-judge court to consider the case at bar. To ensure finality and appealability, the order will also dismiss the case, without prejudice to seeking appropriate relief in the courts of the Commonwealth of Pennsylvania.

---

7. Actually, even now the existence of a constitutional right to commit adultery is somewhat problematical and has not been expressly recognized in any decisions to which our attention has been drawn. Plaintiff's reliance on *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010, 1018 (1967), seems somewhat fatuous. That case, holding a Virginia miscegenation statute racially invidious, did declare that marriage was a "basic civil right." But the Pennsylvania legislation assailed in the case at bar does not conflict with such a right, but indeed affords it additional protection. The statute is simply a means for protecting the sanctity of marriage, and of deterring disregard for the fundamental obligations of that "basic" civil status.

8. For a description of the situation see *Munn v. Illinois*, 94 U.S. 113, 24 L.Ed. 77 (1876); *Smyth v. Ames*, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898); *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). See also Frankfurter and Landis, *The Business of the Supreme Court* (1927) 263; and Warren, *The Supreme Court in United States History* (1922) III, 296–315.

9. For a recent expression, see Warren E. Burger, "Annual Report on the State of the Judiciary," 62 A.B.A.J. (April, 1976) 443–44.