EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Estrella Graulau Matos en Representación de los menores Rafael Hernández Graulau y Marie Curie Hernández Graulau<br><br>    Peticionaria<br><br>        v.<br><br>Edith Latorre Thelmont por sí y como madre del menor Rafael Hernández Latorre<br><br>      Recurrida | Certiorari<br><br>2004 TSPR 192<br><br>163 DPR \_\_\_\_ |

Número del Caso: CC-2003-464

Fecha: 1 de diciembre de 2004

Tribunal de Circuito de Apelaciones:

                Circuito Regional I

Juez Ponente:

                Hon. Charles Cordero Peña

Abogada de la Parte Peticionaria:

                Lcda. Miriam Ramos Grateroles

Abogados de la Parte Recurrida:

                Lcdo. Luis Edwin González Ortiz
                Lcda. Belén M. Guerrero Calderón

Materia: Reclamación, Participación y Adjudicación de     Herencia

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Estrella Graulau Matos en
Representación de los menores
Rafael Hernández Graulau y
Marie Curie Hernández Graulau

    Peticionaria

        v.

                           CC-2003-464

Edith Latorre Thelmont por sí
y como madre del menor Rafael
Hernández Latorre

    Recurrida

RESOLUCION

San Juan, Puerto Rico, 1 de diciembre de 2004

    A la moción de reconsideración presentada en el caso de epígrafe por la parte recurida, se provee no ha lugar.

    Lo acordó el Tribunal y lo certifica la Subsecretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió un voto concurrente. El Juez Asociado señor Rebollo López, reconsideraría.

                      María I. Colón Falcón
            Subsecretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Estrella Graulau Matos en
Representación de los menores
Rafael Hernández Graulau y
Marie Curie Hernández Graulau

    Peticionaria

                                CC-2003-464

       v.

Edith Latorre Thelmont por sí
y como madre del menor Rafael
Hernández Latorre

    Recurrida

Voto Concurrente de la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, 1 de diciembre de 2004

Concurro porque estimo que los fundamentos de la mayoría son erróneos. Al resolver que para poder ejercer la facultad de mejorar a un hijo común luego de fallecer el causante, que reconoce el Art. 758 del Código Civil, 31 L.P.R.A. sec. 2398,[1] es necesario que la cónyuge

---

[1] Artículo 758 del Código Civil, 31 L.P.R.A. sec. 2398, dispone:

> No obstante lo dispuesto en la sección anterior, podrá válidamente pactarse, en capitulaciones matrimoniales, que muriendo intestado uno de los cónyuges, pueda el viudo o viuda que no haya contraído nuevas nupcias, distribuir, a su prudente arbitrio, los bienes del difunto y mejorar en ellos a los hijos comunes, sin perjuicio de las legítimas y de las mejoras hechas en vida por el finado.

la cónyuge supérstite se encuentre en estado de viudez, este Tribunal, innecesariamente, valida una exigencia contraria a la moral y al orden público, que incide sobre el derecho a contraer matrimonio. Consideramos más atinado evaluar la controversia ante nosotros a la luz del requisito del Art. 758, que dispone que el derecho a mejorar sea exclusivamente para beneficio de los "hijos comunes" del matrimonio. Veamos.[2]

## I.

Este caso nos exige que nos enfrentemos, por primera vez, a una vetusta e ignorada disposición del Código Civil que encarna los valores de la sociedad agrícola española del Siglo XIX, cuya organización económica-familiar, mandaba que la explotación del feudo familiar permaneciera indivisa para su preservación y viabilidad. El Art. 758, en torno al cual gira la controversia medular ante nosotros, proviene del Art. 831 del Código Civil español, en redacción originaria del Art. 663 del Proyecto de Código de 1851. Disposición estatutaria que quedó incorporada finalmente en el código español como una concesión a los territorios forales cuyo Derecho habría de derogarse con el proyecto isabelino.[3]

---

[2] Es innecesario resumir nuevamente los hechos que dan base a la controversia en este caso habida cuenta que los mismos están resumidos extensamente en la Opinión de este Tribunal.

[3] Alpañés, en su extenso análisis del Art. 831 del Código Civil español, homólogo de nuestro Art. 758, describe con gran acierto la importancia de esta disposición para la familia rural asturiana, de composición muy semejante a la de una familia típicamente foral. Indica Alpañés lo siguiente:

> La ordenación familiar asturiana es muy semejante a la foral . . . Las condiciones en que se desenvuelve la economía del labrador asturiano no se diferencian apenas en nada del labrador vizcaíno, o navarro . . . Si el pequeño caserío de una familia labradora asturiana, en las que es muy corriente que el número de hijos pase de ocho, ha de dividirse igualitariamente como suele suceder en Castilla; o si, aun con nombramientos desiguales, ha de verificarse una partición de bienes *in nutura,* la destrucción del caserío es inmediata, y como cada uno de los partícipes no podrá vivir con lo que le corresponda,

El Art. 831 ha sido descrito como la incardinación de "una institución totalmente anómala en nuestro Derecho común, no solo en el aspecto histórico, por carecer de precedentes legales en el Derecho castellano tradicional, sino aun en el marco de nuestro vigente ordenamiento positivo, para cuyos principios sustentadores constituye aquella norma una verdadera subversión jurídica." Díaz Fuentes, "Excepciones legales al personalismo de las disposiciones *mortis causa*", 18 *A.D.C.* 877 (1965). Este artículo es considerado por la glosa española como un injerto proveniente del derecho foral que resulta ajeno "a los principios tradicionales y vigentes del Derecho civil español común." *Id.,* pág. 879.

Se destaca, entre sus propósitos, fomentar el respeto y la lealtad de los hijos y los descendientes comunes, asegurando aquella armonía necesaria que impidiera los litigios en torno a los bienes de la herencia. F. García Goyena, *Concordancia, motivos y comentarios del Código civil español*, Zaragoza, 1974, pág. 357. ("Los efectos de la cláusula eran muy saludables, porque mantenían el respeto y dependencias de los hijos particularmente hacia su madre viuda; y se conservaba así la disciplina doméstica, a más que se evitaban los desastrosos juicios de testamentaría.") En igual sentido, E. González Tejera, *Derecho de Sucesiones*, Tomo II, Ed. U.P.R., 2002, pág. 503. Esta disposición pone en manos del viudo o viuda un poderoso instrumento "para mantener la cohesión familiar y la indivisibilidad del patrimonio, evitando la disgregación de la propiedad inmueble o de establecimientos mercantiles o industriales. . . ." J. Santos Briz, *Derecho Civil*, Tomo VI, Ed. Rev. Derecho Privado, 1979, pág. 635.

---

en fin será la enajenación y el abandono de la aldea para buscar medios de vida en la ciudad o en ultramar.

Alpañés, "La delegación de la facultad de mejorar", 1953 *R.G.L.J.* 273, 275-76.

Se reconoce sin embargo, que no ha tenido el efecto deseado "ya sea porque las condiciones económicas no demandan la fórmula por igual, ya porque la necesidad de consignar la facultad en capitulaciones matrimoniales la hace impracticable en regiones donde este documento es casi desconocido." Alpañés, "La delegación de la facultad de mejorar", 1953 *R.G.L.J.* 273, 284. Véase además, Díaz Gómez, "El nuevo artículo 831 del Código Civil", 1982 *R.D.N.* 405, núms. 117-118. En atención a lo cual se señala que ha permanecido vigente sólo por inercia legislativa. Díaz Fuentes, *op. cit.*, pág. 880. En resumen, esta disposición persigue la permanencia familiar, la conservación y atribución unitaria del patrimonio en la sociedad agrícola española del Siglo XIX, y la asignación de la jefatura doméstica, fruto del concepto de la familia como entidad permanente y continuada.

Este articulado representa además, una excepción a la norma general sobre la indelegabilidad de la función testamentaria. El Artículo 757 del Código Civil, 31 L.P.R.A. sec. 2397, artículo precedente al que nos ocupa, específicamente dispone que la facultad de mejorar no puede encomendarse a nadie dada su naturaleza personalísima. L. Roca-Sastre Muncunill, *Derecho de Sucesiones*, Tomo II, 2da ed., 1997, págs. 236-38. Para Roca-Sastre, el artículo tiene un contenido fiduciario, "que consiste en una delegación que comprende la facultad de mejorar, es decir, de desigualar a los hijos comunes, y la de distribuir entre ellos, los bienes del difunto." Roca-Sastre, *op. cit.*, pág. 237. Esta figura fiduciaria tiene un carácter singular y excepcional en nuestro Derecho sucesorio, de ahí que la doctrina estime que debe ser interpretado restrictivamente. Roca-Sastre, *op. cit.*; Díaz Gómez, *op. cit.*, pág. 414.

Del tenor literal del Artículo 758 se desprenden seis presupuestos para su ejercicio los cuales tienen que concurrir

para su eficacia.  Manresa, *Código Civil*, Madrid, Tomo 6, 1973, pág. 825.  Son estos: 1. que la autorización se conceda en capitulaciones matrimoniales; 2. la existencia de un matrimonio entre el delegante y delegado; 3. que el causante muera intestado; 4. que el cónyuge supérstite no haya contraído nuevo matrimonio; 5. que sobrevivan hijos comunes del cónyuge pre-muerto causante de la sucesión; y, 6. que no se perjudiquen las legítimas y se respeten las mejoras que en vida hubiera hecho el difunto.

Al analizar la controversia planteada ante nosotros, este Tribunal optó por evaluar la misma bajo el prisma del cuarto presupuesto antes mencionado.  Concluyendo entonces que, toda vez que la recurrida había contraído segundas nupcias antes de ejercer la facultad de mejorar que le fue concedida en capitulaciones matrimoniales, se desvanecía la facultad concedida.  Al así hacer, el Tribunal valida una exigencia que a todas luces, "parece una condición no muy ajustada a la ley y a la moral, en cuanto va contra la libertad de contraer matrimonio . . . ."  Scaevola, *Código Civil*, Tomo XIV, Madrid, 1898, pág. 514.[4]  Coincido con la apreciación de Scaevola por ello estimo desacertados los fundamentos de la Opinión del Tribunal.

---

[4].  Si bien Scaevola llama la atención al carácter discriminatorio de la prohibición de contraer nuevas nupcias del Art. 831, éste deja a un lado su preocupación basado en que el Art. 793 del Código Civil español [Art. 722 nuestro], contiene una prohibición similar.  Indicando, que si esa imposición "vale respecto a la institución hereditaria, bien puede tolerarse también relativamente al caso del Art. 831."  Scaevola, *Código Civil*, Madrid, Tomo XIV, 1898, págs. 514-15.  Discrepamos de su conclusión.  No le imprime validez al Art. 831 el hecho de que el Art. 793 adolezca del mismo defecto. Valga señalar lo dicho sobre el Art. 793: "En la mentalidad de la época en que se redactó el código, esta excepción . . . respondía a la idea de que debía evitarse que con los bienes del premuerto o de su familia, el viudo o viuda disfrutara en compañía de otro cónyuge en ofensa a la memoria del fallecido; hoy, se piensa en la frase de que el cónyuge premuerto quiere 'reinar después de morir' o quiere evitar la 'infidelidad *post mortem*'."  O´Callaghan Muñoz, en *Comentarios del Código Civil*, Ed. Bosh, Tomo 4, 2000, pág. 619.  Ciertamente esta disposición parece rémora de un pasado ya superado.

No creemos necesario abundar en demasía sobre el rol preeminente del matrimonio en nuestra sociedad. El propio Código Civil le confiere al contrato de matrimonio categoría de institución social. En el orden axiológico, pocos asuntos gozan del respeto y estima que las que se le confieren a la institución del matrimonio. La libertad de contraer matrimonio ha sido reconocida como uno de los derechos civiles vitales del ser humano, que se revela fundamental para su propia existencia. *E. g., Loving v. Virginia*, 388 U. S. 1, 12 (1967); *Skinner v. State of Oklahoma*, 316 U. S. 535 (1942). Esta institución es eje fundamental del sistema jurídico familiar y se manifiesta a través de todo el Derecho de familia, con claras repercusiones más allá de este ámbito. Es, no tan solo una institución jurídica sino también ética, social y política.

Incuestionablemente entonces, tanto el hombre como la mujer tienen pleno derecho a contraer matrimonio. La toma de esta decisión, con quién hacerlo y cuándo, es un asunto eminentemente personal e íntimo que no debe estar sujeto a intervenciones o coerciones indebidas, salvo que medie un interés de gran preeminencia que así lo justifique. Debemos

---

Adviértase, que el propio Art. 793 dispone que la norma general es que no se puede imponer como condición absoluta en un testamento que no se pueda contraer nupcias. El propio artículo indica que una disposición en ese sentido "se tendrá por no puesta." Vía excepción sin embargo, el Art. 793 permite esa condición cuando quien la impone es el causante y lo hace respecto su viuda o viudo.

Resulta imperioso señalar además, que la Constitución española de 1978 en su Art. 32, reconoce el derecho a contraer matrimonio. En atención a ese mandato constitucional se ha indicado, específicamente en referencia al Art. 793, lo siguiente: "es claramente inconstitucional la prohibición impuesta al viudo o viuda de contraer ulterior matrimonio por su difunto consorte o por los ascendientes o descendientes de éste. . . ." E. Fosar Benlloch, *Estudios de Derecho de Familia*, Ed. Bosh, Tomo I, 1982, pág. 199. En igual sentido, O´Callaghan Muñoz, *op. cit.*, págs. 618-19. Es evidente entonces que la admonición de Scaevola fue atinada; y ahora, al inicio del Siglo XXI, goza de mayor actualidad.

reconocerle a los contrayentes plena autonomía en la adopción de una decisión tan íntima y trascendental como ésta.[5]

Con ese marco doctrinal de fondo, somos del criterio que la exigencia del Art. 758 de que para poder ejercer la facultad de mejorar que allí se dispone, el cónyuge supérstite deba permanecer en estado de viudez --es decir, que le está vedado contraer nuevas nupcias-- constituye una intervención coercitiva injustificada con la libertad de contraer matrimonio. No hemos podido identificar interés preeminente alguno que justifique tal imposición. En vista de lo cual no podemos avalar con nuestro voto los fundamentos bajo los cuales este Tribunal resuelve esta controversia.

## II.

No empece lo anterior, concurrimos con el resultado de la Opinión del Tribunal toda vez que entendemos que la facultad de mejorar concedida a la recurrida en el caso de autos, se tornó ineficaz toda vez que en el matrimonio de ésta con el causante sólo procrearon un hijo.

El Art. 758 es claro al mandar que la facultad de mejorar sea para ejercerse en relación a los "hijos comunes" del matrimonio. Siendo claro el texto de la ley no cabe apartarnos del mismo. Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. *Rivera v. E.L.A.*, 140 D.P.R. 538 (1996); *Ferretería Matos v. P.R.T.C.*, 110 D.P.R. 153 (1980). Advertimos nuevamente, que el Art. 758 es una disposición de carácter excepcional y como tal

---

[5]. Adviértase sin embargo, que la institución del matrimonio está revestida de alto interés público por lo que el Estado puede válidamente reglamentar su celebración, régimen y disolución. *Ortiz v. Saez Ortiz*, 90 D.P.R. 837 (1964). Véase, además, 31 L.P.R.A. secs. 221 *et seq.* En el caso ante nos, el gravamen que el Art. 758 le impone al contrayente no es de tal naturaleza preeminente que se justifique.

debe ser interpretado de forma restrictiva. Roca Sastre, *op. cit.*; Díaz Gómez, *op. cit.*

Roca-Sastre reconoce que este precepto se refiere "a la sobrevivencia al causante de **varios hijos comunes**, no uno solo, entre quienes poder distribuir o a quienes poder desigualar." (Énfasis en original.) Roca-Sastre, *op. cit.*, pág. 238. Scaevola así lo reconoce también, al indicar: "Por la fuerza de los hechos es, pues, **necesaria la pluralidad de hijos**, en atención a que, de no concurrir esta circunstancia, carecería de aplicación el artículo." (Énfasis nuestro.) Scaevola, *op. cit.*, pág. 515. Manresa también avala esta interpretación, al señalar que los hijos "han de ser comunes, habidos de la unión del cónyuge que sobrevive con el premuerto..." Manresa, *op. cit.*, pág. 828. Finalmente, García Goyena, al analizar el artículo 663 del Proyecto de 1851, precursor del Art. 831 del Código Civil español [Art. 758 del nuestro], nos arroja luz sobre la intención del mismo, y nos indica que este artículo recogía la reconocida costumbre en las provincias de Fueros, de autorizar, mediante capitulaciones matrimoniales, al cónyuge supérstite "para que pudiera disponer libremente de los bienes del difunto entre los hijos que quedaran de aquel matrimonio, dando a uno mas o menos que a otro." García Goyena, *op. cit.*, pág. 357.

La existencia de hijos del causante de otro matrimonio en nada varia la norma toda vez que éstos no se tendrán entre los que procede mejorar. "El supuesto que fuese el cónyuge premuerto quien tuviera hijos de un matrimonio anterior, tampoco invalida la delegación." J. Vallet de Goytisolo, *Comentarios al Código Civil y Compilaciones Forales*, Tomo XI, Editoriales de Derecho Reunidas, 2da ed., 1982, pág. 411. Véase además, Elfgen, "La mejora en el vigente Derecho español", 1969 *R.D.N.* 7, 22-23. ("Pero es evidente que, incluso los [hijos] del

premuerto no son mejorables aun cuando heredan juntos a los comunes.")

Resulta evidente entonces que el Art. 758 confiere la facultad de mejorar solamente a hijos comunes habidos entre causante y cónyuge supérstite. Habida cuenta de lo anterior, y toda vez que en el caso de autos el causante y la cónyuge superviviente sólo procrearon un niño, la facultad que le fue concedida a la viuda en capitulaciones matrimoniales perdió toda eficacia. Procedía en su consecuencia revocar los dictámenes del tribunal de instancia así como del foro apelativo, como concluyó este Tribunal en su Opinión.

Anabelle Rodríguez Rodríguez
Juez Asociada