BOSSON, Justice, specially concurring. In 1943 during the darkest days of World War II, the State of West Virginia required students to salute the American flag and decreed that refusal to salute would “be regarded an Act of insubordination” which could lead to expulsion for the student and criminal action against the parent. W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 626-29 (1943). Some students refused to salute, believing as Jehovah’s Witnesses “that the obligation imposed by law of God is superior to that of laws enacted by temporal government.” Id. at 629. They looked for authority in the Bible, Book of Exodus, Chapter 20, verses 4 and 5: “Thou shalt not make unto thee any graven image, or any likeness of anything that is in heaven above, or that is in the earth beneath, or that is in the water under the earth: thou shalt not bow down thyself to them, nor serve them.” Id. (internal quotation marks omitted). Jehovah’s Witnesses considered “the flag is an ‘image’ within this command,” which they were bound by God not to salute. Id. In a ringing endorsement of the First Amendment, the United States Supreme Court struck down the West Virginia statute, noting the irony of the state’s position: “To sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual’s right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind.” Id. at 634. And again, “[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.” Id. at 642. In his concurrence, Justice Black had this to add: The Jehovah’s Witnesses, without any desire to show disrespect for either the flag or the country, interpret the Bible as commanding, at the risk of God’s displeasure, that they not go through the form of a pledge of allegiance to any flag. The devoutness of their belief is evidenced by their willingness to suffer persecution and punishment, rather than make the pledge. Id. at 643 (Black, J., concurring). Considering the times, the Barnette opinion stands today as an act of the utmost courage; it represents one of the Court’s finest moments. Jonathan and Elaine Huguenin see themselves in much the same position as the students in Barnette. As devout, practicing Christians, they believe, as a matter of faith, that certain commands of the Bible are not left open to secular interpretation; they are meant to be obeyed. Among those commands, according to the Huguenins, is an injunction against same-sex marriage. On the record before us, no one has questioned the Huguenin’s devoutness or their sincerity; their religious convictions deserve our respect. In the words of their legal counsel, the Huguenins “believed that creating photographs telling the story of that event [a same-sex wedding] would express a message contrary to their sincerely held beliefs, and that doing so would disobey God.” If honoring same-sex marriage would so conflict with their fundamental religious tenets, no less than the Jehovah’s W itnesses in Barnette, how then, they ask, can the State of New Mexico compel them to “disobey God” in this case? How indeed? Twenty-four years later, during the zenith of the Civil Rights era, the Supreme Court provided a partial answer. In Loving v. Virginia, the State of Virginia, like sixteen similarly situated states with miscegenation laws, prohibited marriage between the white and black races, making it a crime punishable by imprisonment. 388 U.S. 1, 4, 6 (1967). Such laws arose as an incident of slavery and were common in Virginia and elsewhere since early times. Id. at 6. The Lovings, an interracial couple, had been lawfully married elsewhere and wanted to live openly as husband and wife in Virginia. Id. at 2-3. For their honesty, they were prosecuted and convicted; their prison sentences were suspended on condition that they leave Virginia and not return for 25 years. Id. at 3. The Virginia trial judge, in justifying the convictions, drew strength from his view of the Bible: “Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with this arrangement there would be no cause for such marriages. The fact that he separated the races shows that he did not intend for the races to mix.” Id. at 3. Whatever opinion one might have of the trial judge’s religious views, which mirrored those of millions of Americans of the time, no one questioned his sincerity either or his religious conviction. In affirming the Lovings’ convictions, Virginia’s highest court observed the religious, cultural, historical, and moral roots that justified miscegenation laws. See id. The Supreme Court struck down Virginia’s miscegenation statute. Id. at 11-12. Observing that “[t]he freedom to marry has long been recognized as one of the vital personal rights essential in the orderly pursuit of happiness by free men,” the Court held categorically that “[t]here can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause.” Id. at 12. State laws, even those religiously inspired, may not discriminate invidiously on the basis of race. There is a lesson here. In a constitutional form of government, personal, religious, and moral beliefs, when acted upon to the detriment of someone else’s rights, have constitutional limits. One is free to believe, think, and speak as one’s conscience, or God, dictates. But when actions, even religiously inspired, conflict with other constitutionally protected rights — in Loving the right to be free from invidious racial discrimination — then there must be some accommodation. Recall that Barnette was all about the students; their exercise of First Amendment rights did not infringe upon anyone else. The Huguenins cannot make that claim. Their refusal to do business with the same-sex couple in this case, no matter how religiously inspired, was an affront to the legal rights of that couple, the right granted them under New Mexico law to engage in the commercial marketplace free from discrimination. But of course, the Huguenins are not trying to prohibit anyone from marrying. They only want to be left alone to conduct their photography business in a manner consistent with their moral convictions. In their view, they seek only the freedom not to endorse someone else’s lifestyle. Loving, therefore, does not completely answer the question the Huguenins pose. To complete the circle, we turn to our third case. Heart of Atlanta Motel, Inc. v. United States, upheld the federal Civil Rights Act of 1964, a milestone enactment which, among other achievements, declared invidious discrimination unlawful, not just by the state but by private citizens, when providing goods and services in the sphere of public accommodations. 379 U.S. 241, 246, 261-62 (1964). The Act declared: “‘All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations ofany place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion or national origin.’” Id. at 247. A watershed achievement, the Act vindicated nearly a century of frustrated effort to fulfill the promise of the Fourteenth Amendment, to end not only slavery but all of its traces as well. See id. at 244-46. And ending second-class citizenship, being denied a seat in a restaurant or a room in an inn — purely on the basis of one’s race or religion — was a goal that drove the passage of the Act. See id. at 252-53. By the time of the success of the Civil Rights Act of 1964, many states had already passed their own public accommodation laws. See id. at 358-59 (noting that thirty-two states already had public accommodation laws); see also Lisa Gabrielle & Annette K. Sanderson, Discrimination in Access to Public Places: A Survey of State and Federal Public Accommodations Laws, 7 N.Y.U. Rev. L. & Soc. Change 215, 240 (1978) (recognizing that “the existence of numerous state laws facilitated Congress’ acceptance of Title II” of the Civil Rights Act). Today, many states have Human Rights Acts similar to New Mexico’s. See, e.g., 775 Ill. Comp. Stat. Ann. 5/1-102(A) (2010); Iowa Code Ann. § 216.7 (2007); Md. Code Ann., State Government § 20-304 (2009); Nev. Rev. Stat. Ann. § 651.070 (2011). Public accommodations have been expanded to preclude invidious discrimination in most every public business, including the Huguenin’s photography business. Prohibited classifications have been enlarged from the historical classes — race, religion, gender, national origin — to include sexual orientation. See, e.g., Douglas NeJaime, Marriage Inequality: Same-Sex Relationships, Religious Exemptions, and the Production of Sexual Orientation Discrimination, 100 Cal. L. Rev. 1169, 1190 (2012) (“Twenty-one states and the District of Columbia cover sexual orientation in their antidiscrimination laws governing employment, housing, and public accommodations.”). The New Mexico Legislature has made it clear that to discriminate in business on the basis of sexual orientation is just as intolerable as discrimination directed toward race, color, national origin, or religion. SeeNMSA 1978, § 28-1-7(F) (2004). The Huguenins today can no more turn away customers on the basis of sexual orientation — photographing a same-sex marriage ceremony — than they could refuse to photograph African-Americans or Muslims. All of which, I assume, is little comfort to the Huguenins, who now are compelled by law to compromise the very religious beliefs that inspire their lives. Though the rule of law requires it, the result is sobering. It will no doubt leave a tangible mark on the Huguenins and others of similar views. On a larger scale, this case provokes reflection on what this nation is all about, its promise of fairness, liberty, equality of opportunity, and justice. At its heart, this case teaches that at some point in our lives all of us must compromise, if only a little, to accommodate the contrasting values of others. A multicultural, pluralistic society, one of our nation’s strengths, demands no less. The Huguenins are free to think, to say, to believe, as they wish; they may pray to the God of their choice and follow those commandments in their personal lives wherever they lead. The Constitution protects the Huguenins in that respect and much more. But there is a price, one that we all have to pay somewhere in our civic life. In the smaller, more focused world of the marketplace, of commerce, of public accommodation, the Huguenins have to channel their conduct, not their beliefs, so as to leave space for other Americans who believe something different. That compromise is part of the glue that holds us together as a nation, the tolerance that lubricates the varied moving parts of us as a people. That sense of respect we owe others, whether or not we believe as they do, illuminates this country, setting it apart from the discord that afflicts much of the rest of the world. In short, I would say to the Huguenins, with the utmost respect: it is the price of citizenship. I therefore concur. RICHARD C. BOSSON, Justice