IKUTA, Circuit Judge,
with whom KOZINSKI, Circuit Judge, joins, concurring in the judgment:
The majority today holds that we must continue to define an Indian by the “degree of Indian blood” as required by United States v. Bruce, 394 F.3d 1215, 1223 (9th Cir.2005). Maj. Op. at 1110. This is a troubling conclusion, and an unnecessary one. The Bruce blood quantum requirement serves no purpose, because the second prong of the Bruce test adequately defines an Indian based on his “tribal or government recognition as an Indian.” Bruce, 394 F.3d at 1223 (internal quotation mark omitted). In holding that a person is not an Indian unless a federal court has determined that the person has an acceptable Indian “blood quantum,” we disrespect the tribe’s sovereignty by refusing to defer to the tribe’s own determination of its membership rolls. It’s as if we declined to deem a person to be a citizen of France unless that person can prove up a certain quantum of “French blood,” and we declared that adoptees whose biological parents are Italian cannot qualify.
Because there is no need to use the blood quantum test in this context, we should avoid perpetuating the sorry history of this method of establishing a race-based distinction. Early in our history, state courts used blood quantum tests to determine who was a slave and who was free. See Gentry v. McMinnis, 33 Ky. (3 Dana) 382, 385 (1835) (explaining that “[a]ll persons of blood not less than one-fourth African, are (in Virginia and Kentucky) prima facie deemed slaves; and, e converso, whites and those less than one-fourth African, are, prima facie, free”). Even after slavery was abolished, states used blood quantum tests to define “persons of color” and to ensure segregation of “persons of color” from white persons. See, e.g., 1 Pope’s Digest of Stats, of Ark. § 1200 (1937) (defining persons who “belong to the African race,” for the purposes of railroad segregation, as “[pjersons in whom there is a visible and distinct admixture of African blood”); Ga.Code Ann. § 79-103 (1933) (defining “persons of col- *1120 or” as persons who have “any ascertainable trace” of colored blood); Va.Code Ann. § 67 (Michie 1924) (defining a “colored person” as a person “having one-sixteenth or more of negro blood” and “an Indian” as a non-colored person with one-fourth Indian blood). And the same blood quantum tests determined who could vote. See People v. Dean, 14 Mich. 406, 413-15, 425 (1866) (construing state law giving only “white male citizens” the right to vote as excluding persons of African descent unless they had less than one-fourth African blood).
Similarly, states relied on blood quantum tests to prevent white people from marrying persons of color. See Loving v. Virginia, 388 U.S. 1, 6, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). Loving finally invalidated Virginia’s miscegenation laws, which prohibited intermarriage between white persons and nonwhites, and explained that the term “white person” applied “only to such person as has no trace whatever of any blood other than Caucasian; but persons who have one-sixteenth or less of the blood of the American Indian and have no other non-Caucasic blood shall be deemed to be white persons.” Id. at 5 n. 4, 12, 87 S.Ct. 1817 (quoting Va.Code Ann. § 20-54 (I960)).
Our nation also used blood quantum tests to discriminate against nonwhites who wanted to become citizens. Congress decreed that only a “free white person[ ]” could be granted the “privilege of naturalization,” and courts generally construed this requirement to mean that “men are not white if the strain of colored blood in them is a half or a quarter, or, not improbably, even less, the governing test always being that of common understanding.” Morrison v. California, 291 U.S. 82, 85-86, 54 S.Ct. 281, 78 L.Ed. 664 (1934) (internal citation and quotation marks omitted); see also 8 U.S.C. § 703 (1940) (extending the right to be a naturalized citizen only to persons with an approved admixture of blood of specified classes). In ten states, only persons who met the blood quantum requirement for naturalization could own land. See Dudley O. McGovney, The Anti-Japanese Land Laws of California and Ten Other States, 35 Calif. L.Rev. 7, 7-9 (1947). And during World War II, the government took into account the quantum of a citizen’s Japanese blood in determining who would be held in internment camps. See J.L. DeWitt, Final Report: Japanese Evacuation from the West Coast, 194.2, at 145 (1943) (noting that “[m]ixed-blood (one-half Japanese or less) individuals,” among others, were eligible for exemption from evacuation).
The Supreme Court recently reaffirmed opposition to “[a]ncestral tracing of this sort” in laws that serve to enable race-based distinctions. Rice v. Cayetano, 528 U.S. 495, 510, 517, 524, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (holding unconstitutional a Hawaiian constitutional provision that limited voting, by statute, to “any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778”). Because we have no need to use this metric, and because I doubt it would survive strict scrutiny, I join Judge Kozinski’s concurrence in full and concur in the judgment only. It is regrettable that we did not take the opportunity as an en banc panel to remove Bruce’s first prong from our jurisprudence.